429 So.2d 574 (1983)
Bernard W.N. CHILL, Sr., Administrator of the Estate of Ernest B. Covington, Deceased.
v.
MISSISSIPPI HOSPITAL REIMBURSEMENT COMMISSION.
No. 53668.
Supreme Court of Mississippi.
March 30, 1983.
*576 Chill, Chill & Dove, Bernard W.N. Chill, Sr., Jackson, for appellant.
Sanford R. Horton, Jr., Jackson, for appellee.
En banc.
ROBERTSON, Justice, for the Court:
This case presents important questions of first impression in this state regarding state power versus individual rights: whether, under what circumstances, and with what procedural safeguards, may the state demand of the estate of one involuntarily civilly committed to the Mississippi State Hospital (MSH) at Whitfield reimbursement for all or part of the cost of care and treatment there rendered? We hold that under carefully limited circumstances the state has the power to require such reimbursement, that the legislature has by appropriate enactment vested this power in Mississippi Hospital Reimbursement Commission and in the chancery courts of this state, and that the estate of the deceased incompetent has been afforded full due process. We affirm the order of the court below directing reimbursement.

I.
On December 18, 1979, Ernest B. Covington, then 66 years of age, departed this life intestate. On January 22, 1980, Bernard W.N. Chill, Sr., appellant here, petitioned the Chancery Court of the First Judicial District of Hinds County, Mississippi for appointment as Administrator of Covington's Estate. In routine fashion, the order of appointment was entered and the administrator fully qualified for the issuance of letters of administration. In due course notice to creditors was published.
On March 3, 1980, the Mississippi Hospital Reimbursement Commission (MHRC), claimant below and appellee here, probated a claim against the Estate of Ernest B. Covington in the amount of $46,373.72. The claim was based upon care and treatment services rendered to Covington by MSH beginning July 1, 1962, and continuing through and including the date of Covington's death. Administrator Chill contested the claim. After plenary trial on the merits, the Chancery Court on September 11, 1981, released a memorandum opinion allowing MHRC's claim in the amount of *577 $16,230.80, or 35% of the amount originally claimed. An appropriate decree was thereafter filed on September 29, 1981.
Administrator Chill timely perfected his appeal to this Court, challenging in its entirety this final decree. The case has been thoroughly briefed by the parties, and the Court has received oral argument. The important issues tendered are now ripe for decision.

II.
Ernest B. Covington entered this life in the year 1913. He apparently served approximately one year in the United States Army. At the beginning of the year 1951, he was married and the father of two children. He was employed as a bus driver in the City of Jackson. Beginning in that year and continuing for the next 28 years, little went well.
On March 30, 1951, Covington was involuntarily committed to the Mississippi State Hospital at Whitfield, Mississippi via proceedings had in the Chancery Court of the First Judicial District of Hinds County, Mississippi. According to the record, Covington had made threats of physical harm to various persons. The commitment papers reflect that he was examined by two physicians as then required by law and assigned a diagnosis "paranoid psychosis". The diagnosis made by the professional staff at MSH was "Schizophrenia, paranoid type". Between April 6, 1951, and May 11, 1951, Covington received electroshock therapy 16 times.
It is not clear from the record whether Covington was released, escaped, or, as suggested at oral argument, "simply walked off". In any event, Covington was back on the streets of Jackson in early July of 1953. On July 7, a new civil commitment proceeding was instituted, again in the Chancery Court of the First Judicial District of Hinds County, Mississippi. The examining physicians gave a diagnosis of schizophrenia, paranoid type, and the Chancery Court promptly entered the commitment order.
The voluminous record of Covington's experiences at MSH was introduced in the court below. Suffice it to say that in the early years of his commitment, Covington vehemently and consistently demanded that he be released. The hospital progress notes on Covington reflect constant fears that he would be given more shock treatments  as he ultimately was. After several years the MSH staff described Covington as possessing "terrific hostility" and a "great potential for homicide" and ordered a prefrontal lobotomy, which was performed on January 18, 1957.
A progress note of February 21, 1962, says of Covington: "He remains quiet most of the time and causes no real disturbance. However, it is felt that he is still potentially quite dangerous. He refuses his medication much of the time and it is suspected that he doesn't take it at times when he appears to do so." A progress note of January 20, 1964, indicates that Covington had been taken off electric shock treatments for approximately three months, but that his attending physician had decided to resume shock treatments "once weekly or twice weekly". By October of 1964, Covington was being shocked once weekly and "at this time is being considered for another lobotomy".
There are few happy moments that followed. Suffice it to say that on July 9, 1979, some 26 years after his second commitment, Covington was described as "quiet, withdrawn, ... sits almost immobile with schizophrenic posturing. He covers his face and eyes with his hands and sits this way for long periods of time... . His voice is a very constant monotone when he speaks and if not prodded, stimulated and assisted in meeting his basic personal needs, these would be virtually totally neglected by him." On December 18, 1979, Covington died peacefully.

III.

A.
The claim at issue has been asserted under the authority of the Mississippi Hospital Reimbursement Commission Act, which became law on July 1, 1962. See Miss.Code *578 Ann. §§ 41-7-71 et seq. (1972). This Act begins in Section 41-7-71 with an important declaration of policy. It provides, in pertinent part, that free hospitalization and treatment shall be available to Mississippi residents at various state institutions where those individuals are not financially able to afford such hospitalization or treatment. The statute goes on to provide, in pertinent part, that
"no person shall be deemed entitled to free hospitalization or treatment offered by any such state institution who shall possess a sufficient estate or be entitled to receive sufficient income to cover all or a part of his or her maintenance and support as a patient or inmate of any institution, or who has a person or persons legally chargeable with his or her support who is or are financially able to pay for the maintenance and support of the said person as a patient." [Emphasis added]
Section 41-7-73 then makes it clear that the Mississippi State Hospital at Whitfield is an institution within the meaning of this Act.
The Act then creates the Mississippi Hospital Reimbursement Commission, appellee here, and empowers it, inter alia,
"to assess and collect charges from patients, patients' estates and from all persons legally liable for the cost or care of such patients in any state institution."
Section 41-7-79 further provides, in pertinent part, that
"The Commission shall investigate or cause to be investigated the financial ability of each patient, his or her estate, and all other persons legally liable for the cost or care of the patient, and the charges assessed shall be in accordance with the ability of the person assessed to pay... . The commission shall adopt policies which will not work an undue hardship on any patient or person legally responsible for such a patient. ... [Emphasis added]
The statute then empowers MHRC to institute suits against persons legally liable to collect for care and treatment rendered patients at state institutions. It is under this statute, Section 41-7-79, that MHRC probated the claim which has given rise to the instant appeal.

B.
The evidence at the hearing below established without contradiction several important matters. First, without doubt, Ernest B. Covington was a patient at the Mississippi State Hospital from July 7, 1953, until his death on December 18, 1979. He was certainly a patient for the period July 1, 1962 to December 18, 1979, the period for which claim has been made here. Second, Covington was severely mentally ill during most, if not all, of this period of time. Third, the State of Mississippi through the personnel and facilities at the Mississippi State Hospital did in fact render care and treatment to Covington during all of this period of time. Finally, without doubt, the sum originally claimed by MHRC, let alone the much lower sum actually allowed by the Chancery Court, was substantially below the actual cost to the State of Mississippi of the care and treatment rendered to Covington.
By virtue of his having been a veteran, Covington was entitled to and did receive certain benefits from the Veterans Administration. These benefits were received into a guardianship created by decree of the Chancery Court of the First Judicial District of Hinds County, Mississippi. Deposit Guaranty National Bank of Jackson, Mississippi served as guardian through 1974 when it resigned. Thereafter, Bernard W.N. Chill, Sr., appellant here in his capacity as Administrator, was appointed guardian and he served in that capacity until Covington's death.
Over the years out of the funds received from the Veterans Administration into the guardianship, an aggregate of $7,438.00 was paid by the guardian to MSH for the care and treatment of Covington. These payments were made $80.00 here, $100.00 there, over a substantial period of time. MHRC claims that, pursuant to its regulations adopted in accordance with § 41-7-79, Covington's estate owed $53,811.72. After giving *579 credit for the $7,438.00 paid over the years, MHRC in fact claims $46,373.72.
At the time of his death, Covington's estate had accumulated some $25,000.00. Presumably, most, if not all, of this money came from the Veterans Administration. Pursuant to order entered June 10, 1980, the Chancery Court set aside the sum of $5,000.00 for Mrs. Carrie Crittendon Covington as her widow's allowance. Additional sums have been paid out of the estate for attorneys fees and legal expenses, primarily to finance the instant litigation. In this context, the Chancellor determined that
"This estate is liable for a part of the claim probated by the State of Mississippi through the Hospital Reimbursement Commission and that a payment of Thirty-Five (35%) percent of the claim filed, or $16,230.80 would be fair and equitable in the premises."
The amount of the claim thus allowed, if our arithmetic abilities do not fail us, will, when added to the other sums expended or set aside by the administrator, just about exhaust the assets of the Estate of Ernest B. Covington.

IV.

A.
The first question presented is whether the state has the power to establish a reimbursement scheme and exact from involuntarily committed patients, their estates and from those legally liable for their care, all or part of the expenses of care and treatment. Clearly, the state can establish such a reimbursement scheme where the patients are voluntarily admitted. But where the patient has been civilly committed against his will, where he insists that he does not want the care and treatment the state wishes to provide him, does the state not only have the power to commit him and deprive him of his liberty but also to send him a bill for its trouble? We answer in the affirmative.
The people who created this state's organic law have signified their interest in the care and treatment of the mentally ill. They have vested in the legislature the duty to provide for such care and treatment. Miss. Const. (1890), Art. 4, § 86. It is regrettable but undeniably true that some mentally ill persons, because of their illnesses, present a threat of harm to persons and property of others  as well as to themselves. Under the doctrine of parens patriae the state has necessarily and legitimately assumed a responsibility as guardian of the mentally ill. In Re Oakes, 8 Law Rep. 122 (Mass. 1845); In Re Ballay, 482 F.2d 648, 658-659 (D.C. Cir.1973).
Performing this guardianship function, even  and perhaps particularly  when done in an enlightened and humane manner, is expensive. The state must support its mental health services; they do not come free. It may secure these funds from general revenues (including for a while federal revenues), or it may assess the costs directly against the beneficiaries of such services, or some combination of the two. Of course, under the rationale posited above, both the individual patient and the people in general are beneficiaries of involuntary civil commitments. As long as the State of Mississippi limits such commitments to those, and only those, truly in need of mental treatment, and as long as the state confines its mental patients under humane conditions and provides minimally adequate care and treatment, it is not unreasonable to require the patient, his family or his estate to pay at least a part of the bill.
The fact that other states have been empowered under their constitutions and laws to exercise a particular power, of course, does not establish that the State of Mississippi has such a power. Our research has revealed, however, that a vast number of states do in fact exercise the power invoked by MHRC here. Without intending to be exhaustive, a sampling of states so empowered and the cases in which those powers have been exercised include Florida: Department of Health and Rehabilitative Services v. Harrell, 258 So.2d 340 (Fla.App. 1972), affirmed 272 So.2d 151 (Fla. 1973); Maryland: Koyce v. State, 422 A.2d 1017, 1021 (Md. 1980); New York: In Re Hessney's Will, 177 Misc. 781, 31 N.Y.S.2d 980, *580 985 (1941); Texas: State v. Morris, 303 S.W.2d 802, 803 (Tex.Civ.App. 1957); and Wisconsin: Bank of Sturgeon Bay v. Department of Health and Social Services; 98 Wis.2d 261, 296 N.W.2d 736, 741 (1980); see also, Developments in the Law, Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190, 1365-1372 (1974); and 44 C.J.S. Insane Persons § 75b(2). Constitutional attacks upon these statutes in other states have generally failed. See Annotation, Constitutionality of Statute Imposing Liability Upon Estate or Relatives of Insane Persons for His Support in Asylum, 20 A.L.R.3d 363, 366-369 (1968).
We hold that the State of Mississippi has the constitutional power to provide that a citizen who is mentally ill or in substantial need of mental treatment may be involuntary committed for care and treatment to an institution such as the Mississippi State Hospital at Whitfield and that thereafter the state may charge that person, his estate or persons legally responsible for him with all or a part of the reasonable costs of necessary care, custody and treatment services actually rendered. This power, of course, is exercisable only by the legislature.

B.
Our next question is whether the state has exercised this constitutional power. More specifically, has the Legislature of the State of Mississippi enacted that persons involuntarily committed, as distinguished from voluntarily admitted patients, are so liable?
We note that the Mississippi Hospital Reimbursement Commission Act, Miss. Code Ann. §§ 41-7-71 et seq. (1972) fails to provide an unequivocal answer. Because the statute does not by clear provision empower MHRC to seek reimbursement from involuntarily committed patients or their estates, Administrator Chill argues that MHRC's claim here must fail. Acceding to the proposition that the state has the power, the argument is that the legislature has failed to enact a statute expressly vesting that power in MHRC and subjecting involuntarily committed patients such as Covington (and their estates) to an obligation of reimbursement.
At common law the maintenance of the mentally ill by the public created no obligation upon private parties. District of Columbia v. H.J.B., 359 A.2d 285, 292 (D.C. App. 1976); see also, 44 C.J.S., Insane Persons § 75b(1). A state's right to reimbursement for maintenance and treatment of mentally ill persons exists only by virtue of statutory grant of that right. State v. Morris, 303 S.W.2d 802, 803 (Tex.Civ.App. 1957). If the legislature of the State of Mississippi has enacted no statute which vests this power in MHRC, Administrator must prevail on this appeal.
In the statute creating and authorizing the Mississippi State Hospital at Whitfield, the legislature has expressly provided that the hospital has been
"established for the care and treatment of lunatics and insane persons, free of charge, except as otherwise provided." Miss. Code Ann. (1972) § 41-17-1. [Emphasis added].
The only statute the legislature has passed which might arguably be held to "otherwise provide" is the Mississippi Hospital Reimbursement Commission Act, cited above. The act expressly provides that
"no person shall be deemed entitled to free hospitalization or treatment offered by any such state institution [including the Mississippi State Hospital at Whitfield] who shall possess a sufficient estate or be entitled to receive sufficient income to cover all or a part of his or her maintenance and support as a patient or inmate of any institution, ...."
Our question is whether these words properly should be construed to include persons involuntarily committed to any such state institution. For the reasons explained below, we find this construction proper.
First, at the time this statute was enacted in 1962, the legislature was surely aware that a substantial percentage of the persons who were patients at the Mississippi State Hospital at Whitfield had been *581 involuntarily committed. In this context, the statute should be construed to cover all patients at MSH absent an express exclusion. No such exclusion or intent to exclude may be found.
Second, the statute uses the phrase "a patient or inmate of any institution, ... ." To be sure, the word "inmate" is highly inappropriate, no doubt a product of the insensitivity of the time, two decades ago. Nevertheless, the word "inmate" connotes a person who has been sent to the Mississippi State Hospial at Whitfield against his will. The use of the wording, "patient or inmate" may sensibly be read as the legislature's signal that it intended to include voluntary and involuntary patients.
We recognize further a substantial and legitimate public purpose in requiring reimbursement of and from involuntarily committed patients and their estates. In-patient care of mentally ill persons is quite costly to the State of Mississippi. Not only must the patient be housed, clothed and fed, he must be provided care and treatment. Great expense is involved in rendering these services effectively. True, the involuntarily committed patient has in part been institutionalized for the protection and safety of society. But today there can be no doubt that a necessary predicate to involuntary civil commitment is a determination that the person is seriously mentally ill and in substantial need of professional care and treatment. In substantial part he is hospitalized for his own good. Seen in this context, the legislature may reasonably have enacted that the state may seek to recoup a small portion of the expense it has incurred. We find that it has done so.
On the basis of the evidence thus available to us and on the basis of sound principles of statutory construction, we hold that the Mississippi Hospital Reimbursement Commission Act, Miss. Code Ann. (1972) §§ 41-7-71 et seq. includes both voluntary and involuntary patients at the state institutions named in the Act, specifically including MSH. The Act thus constitutes an exception to the general rule of Section 41-17-1 that persons shall be entitled to treatment at MSH "free of charge."
If the legislature should be of the opinion that we have incorrectly construed its enactment, it has full power to eviscerate this portion of our decision. By the same token, if the legislature should agree that we have correctly construed the act but desire to change the law to provide that involuntarily committed persons may not be subjected to payment of all or part of the cost of care, custody and treatment they do not wish, it has full power to so provide. Unless and until the legislature acts, however, the word "patient" and other synonymous words used in the Act are construed to include both persons voluntarily admitted and those involuntarily committed.

C.
Next Administrator Chill urges that, as applied in this case, the Mississippi Hospital Reimbursement Commission Act is an ex post facto law. Covington's second involuntary commitment occurred in July of 1953. The act on the authority of which reimbursement is here sought was not placed in our statute books until 1962, some nine years later. Administrator argues that the act can only apply to patients civilly committed after the effective date of the act, July 1, 1962. The argument must be rejected for two reasons.
First, it is true that the present Act did not become effective until July 1, 1962. A previous act, however, requiring reimbursement from solvent incompetent persons for care and treatment at state mental hospitals was in effect at the time of both commitments. See Miss. Code Ann. § 6909-13 (1942).
Second, the courts of other states have confronted this same question. With the exception of one case now arguably overruled, the authorities seem unanimous in holding that legislatures have the power to permit recovery of expenses incurred in the maintenance, care and treatment of an incompetent person from him or his estate, etc., and that such recovery may constitutionally be had with respect to persons committed *582 prior to the passage of the act. See, e.g., State v. Romme, 93 Conn. 571, 107 A. 519 (1919); Department of Public Welfare v. A'Hern, 14 Ill.2d 575, 153 N.E.2d 22 (1958); Department of Mental Health v. Salmar, 82 Ill. App.2d 450, 226 N.E.2d 511 (1967); and Department of Health and Rehabilitative Services v. Harrell, 258 So.2d 340 (Fla.App. 1972), affirmed 272 So.2d 151 (Fla. 1973).
In any event, the claim probated by MHRC against the Estate of Ernest B. Covington on its face begins July 1, 1962. MHRC has made no attempt whatsoever to recover any sums for care, treatment or custody prior to July 1, 1962. Beyond that, the chancellor's allowance of only 35% of the claim reinforces the conclusion that nothing is claimed against the estate for anything occurring before the effective date of the Act. There is no merit to this assignment of error.

V.

A.
Administrator Chill argues here, as he did below, that MHRC's mulcting of the Estate of Ernest B. Covington may not withstand scrutiny under due process clauses of Amendment XIV, § 1 of the Constitution of the United States and of Article 3, § 14 of the Mississippi Constitution of 1890.
Administrator focuses his thrust on the proposition that Covington's procedural due process rights were violated at the time of his commitment in July of 1953. The argument then takes a quantum leap. Assuming arguendo that Covington was not afforded procedural due process at the time of commitment, does it flow inexorably that the reimbursement claim submitted by MHRC cannot withstand due process scrutiny  and thus must be denied in its entirety? We think not.

B.
There has within the past decade been an explosion of litigation regarding the substantive and procedural rights of persons suffering from mental illness or defects. This litigation has sensitized us to the fact that there were indeed gross constitutional deficiencies in our civil commitment procedures authorized and employed in the 1950s and before. But none of this sheds much light on the question properly tendered here.
The rights of mental patients generally find their content in two sources. First, there is a federal constitutional minimum. The most basic liberty interests of persons have been given substantive protections by the due process clause of the Fourteenth Amendment. Translated into the present context, a person may not be involuntarily committed to a state mental institution (a) without there being clear and convincing evidence that the person is indeed in substantial need of mental treatment and (b) without the state in fact rendering to such individual a minimally adequate course of care and treatment. See Wyatt v. Stickney, 334 F. Supp. 1341 (M.D. Ala. 1971); enforced 344 F. Supp. 373 and 387, affirmed 503 F.2d 1305 (5th Cir.1974); Vecchione v. Wohlgemuth, 377 F. Supp. 1361 (E.D.Pa. 1974); Colyar v. Third Judicial District Court for Salt Lake County, 469 F. Supp. 424 (D.Utah 1979). See also, Mills v. Rogers, ___ U.S. ___, ___-___ fn. 16, 102 S.Ct. 2442, 2448 fn. 16, 73 L.Ed.2d 16, 22-23 fn. 16 (1982); Youngberg v. Romeo, ___ U.S. ___, ___-___, 102 S.Ct. 2452, 2457-58, 73 L.Ed.2d 28, 36-37 (1982).
Second, any higher or broader state created rights afforded the mentally ill must be identified. The federal constitutional protections represent only a minimum. Without doubt the State of Mississippi, particularly with the enactment of the new civil commitment act effective July 1, 1976, has vested rights in the mentally ill substantially in excess of those minimum protections required by the federal constitution. See Miss. Code Ann. §§ 41-21-61 et seq. (1972), as amended. Pre-existing that enactment were the basic liberty interests described in the preceding paragraph secured as rights by virtue of this state's due process clause. Art. 3, § 14, Miss. Const. (1890).
*583 No person may be deprived of his substantive rights  those grounded in the federal constitutional minimums or in the expanded constitutional or statutory creations of the state  without due process of law. Without hesitation we recognize the procedural due process rights of the mentally ill when faced with the loss of their substantive rights via involuntary commitment and maintenance.[1] See, e.g., Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); Addington v. Texas, 441 U.S. 418, 425-426, 99 S.Ct. 1804, 1808-09, 60 L.Ed.2d 323, 330-331 (1979); Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). Upon these authorities Administrator Chill places great reliance in his due process argument here. Had he in his former capacity as guardian invoked these cases in support of a habeas corpus application, he no doubt would have been entitled to relief.[2] In the present context, however, they do not carry him far.

C.
Careful attention to the two step analysis described above charts our resolution of the issue tendered here. First, what is the substantive right at stake? Second, has procedural due process been afforded in connection with the state's taking of that right?
A critical reading of Administrator Chill's brief may suggest that he has misperceived the substantive right identification step in the analysis. He talks at length about denials of procedural due process. But the substantive right denied thereby is [was (?)] Covington's right to personal liberty. The substantive rights actually at stake in the instant litigation are quite different.
We are concerned with Administrator Chill's duty to collect and administer the assets of the Covington estate and, after payment of just debts, to distribute those assets to his heirs at law, juxtaposed against MHRC's allegation that its reimbursement claim is one of those just debts. The positive law provides certain conditions which must be met before MHRC's claim may be allowed. To be sure one of those conditions  that Covington was substantially mentally ill and in need of mental treatment  overlaps with that required for civil commitment. But the substantive rules of law applicable today, those rules which vest substantive rights in Administrator Chill which may not be abridged without due process of law, those rules upon the basis of which MHRC asserts its reimbursement claim, are different,  different from the rules applicable back on July 7, 1953, and even different from those potentially applicable any day thereafter Covington may have sought release via habeas corpus.
Substantively speaking, Ernest B. Covington during his lifetime had a right not to be involuntarily committed to and *584 maintained and treated at the Mississippi State Hospital at Whitfield unless he was in fact mentally ill and in substantial need of mental treatment. Art. 3, § 14, Miss. Const. (1890). Beyond that, once involuntarily committed, Covington had a substantive right not to be "warehoused". If he was indeed substantially mentally ill, the state had a right to commit him involuntarily only on the condition that it afforded him minimally adequate care and treatment. Art. 3, § 14, Miss. Const. (1890); Miss. Code Ann. §§ 41-21-61 et seq. (1972) as amended.
We have held in Section IV(A), where these substantive rights of persons such as Covington have been respected, the state has the constitutional power to require reimbursement of or from him or his estate for the reasonable cost of care and treatment necessarily rendered. We have likewise held in Section IV(B) that the legislature has enacted that the state shall indeed, via the Mississippi Hospital Reimbursement Commission, appellee here, have and exercise the right to demand reimbursements.
The true question tendered by Administrator Chill's due process point is whether, in its attempt to exact from the Covington estate the cost of care and treatment, MHRC, or the court below, has trampled upon any due process rights vested in appellant Chill, as administrator of Covington's estate. Without doubt Covington was denied both substantive and procedural due process at the time of his commitment in 1953. That merely means that MHRC must prove the legitimacy of its reimbursement claim. MHRC cannot in the present context rely on any notion of collateral estoppel to establish that Covington was in fact mentally ill and in substantial need of institutionalization. MHRC was required to prove that fact anew. This it did in the proceedings below.
We hold that, in the context of the case at bar, the only procedural due process rights of relevance were those of appellant Chill, as administrator of Covington's estate, that, before the estate could be depleted at the hands of MHRC, the estate had to be afforded a reasonably adequate adversary hearing before an impartial judicial officer, at which time MHRC had to prove by a preponderance of the evidence each factual point requisite to the substantive validity of its reimbursement claim. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 37 L.Ed.2d 556 (1972); North Georgia Finishing, Inc. v. DiChem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975).
That the general contours of procedural due process as fleshed out in the cases just cited apply to the sort of reimbursement claim being made here has been recognized in Fayle v. Stapley, 607 F.2d 858, 861 fn. 2 (9th Cir.1979); Vecchione v. Wohlgemuth, 377 F. Supp. 1361, 1370-1371 (E.D.Pa. 1974); and McConaghley v. City of New York, 60 Misc.2d 825, 304 N.Y.S.2d 136 (1969). What is clear from these cases is that the state agency, such as MHRC, may not merely indulge in self help with respect to the funds or estate of involuntarily committed patients.[3]
Here full due process has been afforded the state and its Administrator. Reasonable advance notice and opportunity to be heard was afforded both sides in the proceedings in chancery court below, and at a hearing held June 11, 1981, in every respect conforming to the procedural due process requirements of the cases cited above, it was established beyond peradventure:
(a) that Ernest B. Covington suffered from serious mental illness at all times pertinent hereto,
(b) that the Mississippi State Hospital at Whitfield administered minimally adequate care and treatment to Covington,
(c) specifically, that the treatment services rendered after July 1, 1962, were reasonably necessary under the circumstances as were the care and custodial services; and
*585 (d) that the sum for which reimbursement has been allowed is reasonable and, in fact, represents only a fraction of the actual cost of the State of Mississippi in maintaining and providing such care, custody and treatment services.
In short, Administrator was provided a full and adequate hearing. If he could have proved that Ernest B. Covington was not mentally ill, that would have been a defense to the claim at bar. If he had proved that Covington was not in fact treated, or that the treatment services rendered were not minimally adequate, that would have been a defense to the claim at bar. If he could have proved[4] that the treatment rendered was not reasonably necessary, i.e., was not reasonably related to the mental illness or defect Covington suffered, that would have been a defense. These things he did not do, in spite of the fact that on these and other points, Administrator Chill had full and fair opportunity to resist the claim. He had full procedural due process. At the conclusion of the hearing of June 11, 1981, the chancellor took the matter under advisement and three months later released his decision allowing the claim in the amount of $16,230.80.
We hold that, under the foregoing facts and circumstances, the State of Mississippi via MHRC had no power to exact the aforesaid sum from the Estate of Ernest B. Covington except under those substantive conditions prescribed by the positive law  the constitution and laws of the State of Mississippi, at all times undergirded by federal constitutional minimums. We further hold that MHRC could not constitutionally obtain this reimbursement without first establishing that these substantive conditions had been met at a hearing affording Covington's estate's administrator full procedural due process. We further hold that under the facts and circumstances cited above, Administrator Chill, in his official capacity and on behalf of the heirs and survivors of Ernest B. Covington, received full procedural due process. All substantive conditions prerequisite to the reimbursement claim having been established, the assignment of error on this point is not well taken and will be denied.

VI.
Administrator Chill argues further that the State of Mississippi has waived its claim, if any, to seek reimbursement here. The theory has been stated variously in the prior proceedings. Below, Administrator Chill pleaded limitations and laches. Perhaps sensing that limitations and laches do not run against agencies of the state,[5] here he argues waiver and estoppel. However, phrased or labeled, the point is the same.
The factual predicate here is Chill's insistence that Mississippi State Hospital never sent the guardian any bill for care and treatment services rendered over the 28-odd years that Covington was an involuntary patient at MSH. He contends that MHRC cannot now at this late date, upon discovery that there are some assets in the Covington Estate, assert this claim and wipe out the estate.
On distinguishable facts, there is indeed some precedent for such a waiver claim. At least two New York cases hold that the state cannot allow years and years to roll by without making claim and then, suddenly, upon the patient's discharge or death, demand his estate. Matter of Cross's Estate, 99 Misc. 199, 165 N.Y.S. 710, 711 (1917); In Re Hessney's Will, 177 Misc. 781, 31 N.Y.S.2d 980, 985 (1941).
Here, the facts are wholly inconsistent with Administrator's waiver or estoppel theory. For years Covington's guardian was making modest periodic payments to *586 Mississippi State Hospital at Whitfield for Covington's care, custody and treatment. The payments actually made, at rates of $80.00 to $100.00 a month, totalled $7,438.00. Absent evidence to the contrary, we will assume that these payments were made pursuant to lawful authority given by the Chancery Court to the guardian. We will assume further that these payments were reported on the annual accountings and were ratified and approved by the court. Seen in this light, Administrator Chill's waiver argument evaporates.
If anything, Chill is the one who is estopped. We will not allow a guardian to make regular payments under these circumstances for a period of years and then claim surprise  and waiver and estoppel  when at the patient's death the state makes a claim for "the balance". Beyond that, there is nothing in the Mississippi Hospital Reimbursement Commission Act which requires that the claim of MHRC be asserted before the death of the patient. That it may be so asserted in no way imports a requirement that it must be.
Notice to creditors was originally published by Administrator Chill on January 23, 1980. MHRC probated its claim on March 3, 1980. Having done so, it was well within the 90 day limitation prescribed by law. This was the only timeliness requirement MHRC was required to meet under the circumstances. The assignment of error based upon waiver and estoppel, laches and limitations is denied.

VII.
Our next question is whether the allowance made by the chancery court of some $16,230.80 is in any way subject to attack. In this context, we emphasize the strong public policy of providing free care and treatment for persons financially unable to pay for such treatment. See Miss. Code Ann. §§ 41-17-1 and 41-7-71 (1972). Nevertheless, as indicated above, the legislature has provided that patients will be expected to pay their own way to the extent that they are financially able to do so.
The provisions of Mississippi law and the policy undergirding same are quite comparable to that of our sister states. In the State of New York, for example, we find the court in In Re Hessney's Will, supra, stating
"I do not believe it was the intention of the legislature to provide that the estate of any deceased person should be charged ... to such an amount as to leave his surviving widow and children penniless." 31 N.Y.S.2d at 985.
A Texas case, State v. Morris, 303 S.W.2d 802, 803 (Tex.Civ.App. 1957), is also instructive. In Morris a mentally ill person was committed in 1933. Twenty years later he inherited some $10,000.00. The State of Texas immediately sued to get the money for reimbursement of past treatment and services rendered. The court denied the claim but made it clear that the money could be seized to pay for treatment services rendered after the date of inheritance.
We emphasize a salient feature of the legislative scheme. The general policy of this state is that care and treatment at MSH shall be free of charge. Miss. Code Ann. § 41-17-1 (1972). Only those financially able to pay may be charged. Miss. Code Ann. § 41-7-71 (1972). MHRC may not assert reimbursement claims beyond ability to pay. Miss. Code Ann. § 41-7-79 (1972). The plight of relatives or dependents must be considered in determining ability to pay. Miss. Code Ann. § 41-7-79 (1972). In general MHRC has been charged to perform its duties in such a way that no undue hardship shall be worked on any patient or person legally responsible for such patient. Miss. Code Ann. § 41-7-79 (1972).
The legislative policy embodied in these statutes must be taken seriously by chancery courts entertaining MHRC's reimbursement claims. We construe the statutes discussed above to provide that the legitimate needs and comforts of the patient and his or her dependents or surviving *587 relatives hold an absolute priority over MHRC reimbursement claims. These claims may be allowed only where, and only to the extent that, such will not prejudice or hinder the patient or his or her dependent or surviving relatives in providing for their legitimate needs and comforts.
Of course, where a reimbursement claim would run afoul of these standards, it is incumbent upon someone to say so. The needs of the patient or his surviving or dependent relatives are an appropriate subject for proof at trial. Other resources independently available to such persons should also be shown and considered. The source of the assets comprising the estate is also relevant.
Based on the facts in the record before us, a substantial part, if not all, of the funds in the Estate of Ernest B. Covington were received from the Veterans Administration. We find that the chancellor allowed out of the estate $5,000.00 as a widow's allowance. See Miss. Code Ann. § 91-7-135 (1972). He also has allowed certain administrative expenses, attorneys fees and legal expenses. While the point could have been spelled out more fully, the chancellor's determination of the amount of the claim to be allowed is obviously consistent with the policy articulated above to the effect that reimbursement claims shall be allowed to the extent, and only to the extent, that the patient or his estate is financially able to make such reimbursement without substantial hardship.
In view of the fact that this entire estate was built up from benefits "earned" by the veteran, the fact that a $5,000.00 widow's allowance was made, and the absence of any evidence in the record of the condition or needs of the widow or children of the deceased nor of the means or other resources which may be available to the widow or children, the chancellor was well within his discretion in the allowance he made.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, HAWKINS, DAN M. LEE and PRATHER, JJ., concur.
BOWLING, J., not participating.
NOTES
[1] Relating more specifically to some of the facts of this case, we find an increasing tendency on the part of courts to recognize both substantive and procedural due process rights vested in mental patients faced with electroshock therapy [see Bell v. Wayne County General Hospital, 384 F. Supp. 1085, 1099 (E.D. Mich. 1974)], prefrontal lobotomies, [Romeo v. Youngberg, 644 F.2d 147, 166 (3d Cir.1980), vacated on other grounds, supra] or the administration of unwanted antipsychotic drugs [Mills v. Rogers, supra, ___ U.S. at ___-___, 102 S.Ct. at 2448, 73 L.Ed.2d at 22-23; Rennie v. Klein, 653 F.2d 836, 843-844 (3d Cir.1980)]. Here again these due process rights assume meaning only in the context of a correct identification and perception of the individual's substantive rights under the positive law to be free from unreasonable unwanted intrusions upon his person.
[2] What happens if a person has been involuntarily committed without having been afforded procedural due process? Is he entitled to absolute and permanent discharge? Absolutely not! He is entitled to a hearing. He is entitled to that which he has been denied  procedural due process. At that hearing, to be sure, he may assert his substantive rights mentioned above  the federal constitutional minimums as well as state created rights. But if it is established, at a hearing conforming to all of the constitutionally mandated requisites of procedural due process, by clear and convincing evidence, that the person is substantially mentally ill and that he is a person in need of mental treatment [see Miss. Code Ann. § 41-21-61(c) (1972), as amended], back to MSH he goes.
[3] Suffice it to say that, under the authority of these cases, the self help provisions of Miss. Code Ann. § 41-7-90(2) (1972) are constitutionally suspect.
[4] The "if he could have proved" phraseology should not be taken as an indication that Administrator Chill bore the burden of proof on these issues. To the contrary, when asserting reimbursement claims, MHRC must prove by a preponderance of the evidence the required factual bases of its claim.
[5] See, e.g., Gibson v. State Land Commissioner, 374 So.2d 212, 217 (Miss. 1979); Board of Education of Itawamba County v. Loague, 405 So.2d 122, 124-125 (Miss. 1981).