Susan ROCKWELL, Plaintiff, Appellant,

v.

CAPE COD HOSPITAL, et al., Defendants, Appellees.

No. 93–1581.

United States Court of Appeals, First Circuit.

Heard Jan. 4, 1994.

Decided June 16, 1994.

**255**

Steven J. Schwartz, Ltd. with whom Susan Rockwell pro se was on brief for appellant.

Cailie Currin and Timothy A. Clune on brief, for Disability Advocates, Inc., amicus curiae.

John M. Dellea, with whom Jeanmarie Papelian, Ficksman & Conley, were on the briefs, for appellee Joan Marie Corr, M.D.

Leslie Lockard and Gaffin & Krattenmaker, P.C., were on the brief for appellee Cape Cod Hosp.

Colleen M. McKenna, with whom Mary Morrissey Sullivan, Richard L. Nahigian and Sullivan, Sullivan & Pinta, were on brief, for appellees Benjamin Ianzito, M.D. and Cape Cod Hosp.

Joel I. Klein, Paul M. Smith and Klein, Farr, Smith & Taranto on brief, for The American Psychiatric Ass'n, amicus curiae.

Before TORRUELLA, Circuit Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Circuit Judge.

Susan Rockwell ("Rockwell") brought this 42 U.S.C. § 1983 action *pro se* in the district court against Cape Cod Hospital ("the Hospital"), a private institution, and two private physicians, who pursuant to Mass.Gen.L. ch. 123, § 12, involuntarily restrained her, admitted her to the Hospital and gave her medication. The doctors moved to dismiss the complaint. The court allowed the motion and entered final judgment in this case, dismissing all claims against all defendants.

## STANDARD OF REVIEW

We review the grant of a motion to dismiss *de novo*, taking the allegations in the complaint as true and making all reasonable inferences in favor of plaintiff. *Rumford Pharmacy, Inc. v. East Providence*, 970 F.2d 996, 997 (1st Cir.1992). We must liberally construe Rockwell's *pro se* complaint and affirm its dismissal only if she cannot prove any set of facts entitling her to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

## BACKGROUND

On January 26, 1992, Rockwell entered the Emergency Room of the Hospital in Hyannis, Massachusetts to inquire about the precise location and time of an Alcoholics Anonymous ("AA") meeting which she knew was in a building on the grounds of the Hospital. Apparently concerned about her appearance, Hospital personnel suggested that she speak with a social worker. Rockwell agreed to do so, in lieu of her regular AA meeting.

After a brief conversation, the social worker contacted a Hospital physician, Dr. Joan Corr ("Dr. Corr"). Over Rockwell's objection, Dr. Corr ordered that her body and clothes be searched. According to Rockwell, she asked to telephone both her father, who is a physician, and her private psychiatrist, Dr. Christine Barney, but her requests were denied. Rockwell maintains that she then

urged Dr. Corr to call her treating therapist, but that request was also ignored. Without her consent, Dr. Corr telephoned the local mental health center and obtained access to her psychiatric records maintained by that facility.

Dr. Corr ordered that Rockwell be physically restrained. After Rockwell refused to consent to medication, Dr. Corr ordered the forcible administration of anti-psychotic drugs. Dr. Corr signed the order admitting Rockwell to the Cape Cod Hospital on the evening of January 26, 1992 without Rockwell's consent.

According to Rockwell, she was awakened after midnight, while heavily drugged, and told to sign a "voluntary application" for admission to the Hospital. Rockwell repeatedly asked to see another doctor and to be released to the care of her treating psychiatrist. On January 27, 1992, Rockwell was allowed to sign a request for discharge. Dr. Benjamin Ianzato, another Hospital physician, examined Rockwell that same day and found no indications of dangerousness, suicidal thinking, or need for involuntary detention. On January 28, he agreed to discharge her to the care of a friend with the concurrence of her personal physician.

On January 19, 1993, Rockwell filed a civil rights action in the district court, seeking damages against Dr. Corr, Dr. Ianzato, the Hospital, and the Commonwealth of Massachusetts [1] for the violation of her federal constitutional rights to free speech, liberty, privacy, and procedural due process. Rockwell alleged that she was illegally and unnecessarily committed by doctors Corr and Ianzato and thereby deprived of her physical freedom and privacy. She also claimed that she was improperly confined by the Hospital. The complaint further alleged that both physicians and the Hospital physically restrained and forcibly drugged her, without cause and without legal authority. Finally, the complaint stated that Rockwell, while heavily sedated and partially asleep, was coerced into signing a voluntary admission form by Dr. Corr and the Hospital.

The defendants moved to dismiss. On April 16, 1993, the district court entered a final judgment in this case, dismissing all claims against all defendants. The district court held that Dr. Corr was immune from liability under a state statutory provision, Mass.Gen.L. ch. 123, § 22. The district court also concluded that Rockwell's complaint failed to allege sufficient facts to demonstrate that defendants Corr, Ianzato, and Cape Cod Hospital acted under color of state law as required to state a civil rights cause of action.

On appeal, Rockwell argues that the district court erred (1) in concluding that the defendant-appellants did not act under color of state law, (2) by failing to construe her *pro se* complaint leniently, and (3) by not affording her an opportunity to amend her complaint before dismissing the action. Rockwell also challenges the district court's conclusion that Dr. Corr was immune from liability under state law.

### DISCUSSION

"Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory....'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982). In order to state a claim under § 1983, a plaintiff must show both the existence of a federal constitutional or statutory right, and a deprivation of that right by a person acting under color of state law. *Watterson v. Page*, 987 F.2d 1, 7 (1st Cir. 1993) (citing *Willhauck v. Halpin*, 953 F.2d 689, 703 (1st Cir.1991)).

There is no question that involuntary confinement for compulsory psychiatric treatment is a "massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Rockwell clearly has a liberty interest in being free from unwarranted confinement. The issue before us is whether the Hospital, Dr. Corr and Dr. Ianzato acted under color

1. The Commonwealth of Massachusetts is no longer a party to this case.

of state law when they acted pursuant to Mass.Gen.L. ch. 123, § 12 to restrain and involuntarily admit Rockwell to the Hospital. In other words, we must decide whether private physicians and a private Hospital who "admit" a mentally disturbed person pursuant to the Massachusetts statute act under color of state law.[2] We find that they do not and hence, they are not subject to suit under 42 U.S.C. § 1983.

### Claims against the Hospital

Rockwell's claims against the Hospital are very similar to those brought by the plaintiff against a private hospital in *Harvey v. Harvey,* 949 F.2d 1127 (11th Cir.1992). In *Harvey,* the plaintiff was placed at a private hospital which had been designated by the state as an emergency receiving and evaluating facility for involuntarily committed mental health patients. She alleged that she was placed in a locked ward and given medication against her will. The court of appeals affirmed the district court's dismissal of her 42 U.S.C. § 1983 suit against the hospital. Reasoning that the actions plaintiff questioned were actually the actions of the hospital's employees, not the actions of the hospital itself, the court held that the hospital could not be held liable because "[a] defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis." *Harvey,* 949 F.2d at 1129 (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). The court further found that even if the plaintiff could attribute liability to the hospital directly and not vicariously, her § 1983 claim would still fail because the hospital was not a state actor. *Harvey,* 949 F.2d at 1130.

The court applied three tests to determine if there was state action: the state compulsion test, the nexus/joint action test, and the public function test. *Id.* Finding that the Georgia statutes governing the commitment process for the mentally ill neither compel nor encourage involuntary commitment, the court concluded that the hospital was not a state actor under the state compulsion test. The court further found that the Georgia statute in question did not create a sufficiently close nexus between the state and the hospital to satisfy the second test and therefore mandate the hospital's classification as a state actor. Finding that "the Georgia statute functions as a licensing provision enabling the hospital to receive mental patients" the court held that licensing and regulation are not enough to transform private hospitals into state actors for section 1983 purposes. Finally, under the third test, the court was "unwilling to categorize involuntary commitment in Georgia as a function so reserved to the state that action under the commitment statute transforms a private actor into a state actor" for purposes of section 1983 because the involuntary commitment of patients in Georgia was not traditionally the *exclusive* prerogative of the State, but rather was a power held *co-extensive* with the state. *Id.* at 1131.

Similarly, we apply the state compulsion test, the nexus/joint action test, and the public function test to the facts of this case to determine whether the Hospital can be deemed a state actor. *Id.; see also Rodrigues v. Furtado,* 950 F.2d 805, 814–15 (1st Cir.1991); *Rodriguez–Garcia v. Dávila,* 904 F.2d 90, 96 (1st Cir.1990); *National Broadcasting Co. v. Communications Workers of America,* 860 F.2d 1022, 1026 (11th Cir.1988).

**2.** The Seventh Circuit in *Spencer v. Lee,* 864 F.2d 1376 (7th Cir.1989) determined that when a private physician and a private hospital commit a mentally disturbed person, they do not act under color of state law, and therefore, do not lay themselves open to suit under 42 U.S.C. § 1983 for such conduct. In the present case, we need not decide whether the "commitment" of a mentally disturbed person by private actors constitutes state action. Massachusetts law distinguishes between "commitment" and "admission" to a facility for the psychiatric care of patients. Mass.Gen.L. ch. 123, § 12 captioned "Emergency restraint of dangerous persons; ap-

plication for hospitalization; examination" sets forth the criteria for involuntarily admitting a person for hospitalization who by reason of mental illness would create a likelihood of serious harm. The period of hospitalization under this section cannot exceed ten days. Subsection (d) states "A person shall be discharged at the end of the ten-day period unless the superintendent applies for a *commitment*" under other provisions of chapter 123 or the person remains on a voluntary status (emphasis added). Here, Rockwell was "admitted" to the Hospital pursuant to Mass.Gen.L. ch. 123, § 12.

## A. State Compulsion

Like the statute at issue in *Harvey,* the Massachusetts statute in this case neither compels nor encourages involuntary commitment. Therefore, the Hospital is not a state actor by state compulsion. *See Spencer,* 864 F.2d at 1379 (no state compulsion where Mental Health Code not enacted to encourage commitments). By its terms, Mass. Gen.L. ch. 123, § 12 is permissive, not mandatory.[3] The section merely allows any licensed physician or "qualified psychiatric nurse mental health clinical specialist" to restrain, and to apply for leave to hospitalize, for up to ten days, any person who the physician believes presents a likelihood of serious harm by reason of mental illness. Mass.Gen.L. ch. 123, § 12(a). The provision does not mandate that they do so.

## B. Nexus/Joint Action

■ The Massachusetts statute does not create a sufficiently close nexus between the state and the Hospital to mandate the Hospital's classification as a state actor. Rockwell alleged that the Cape Cod Hospital received Medicare funds and was "authorized to enact ordinances pursuant to 123 Laws of Massachusetts, § 12." First, Mass.Gen.L. ch. 123, § 12 contains no language which authorizes the hospital to "enact ordinances" and Rockwell's first contention is therefore without merit. Second, government regulation, even extensive regulation, and the receipt of federal funds, such as Medicare, Medicaid and Hill–Burton funds, are insufficient to establish that a hospital or other entity acted under color of state law. *Méndez v. Belton,* 739 F.2d 15, 18 (1st Cir.1984); *see also Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (fact that nursing home was extensively regulated insufficient to convert it into a state actor);

*Rendell–Baker v. Kohn,* 457 U.S. 830, 840–43, 102 S.Ct. 2764, 2770–73, 73 L.Ed.2d 418 (1982) (a private school, which taught special needs children and received 90 percent of its funds from the government and was extensively regulated, was not a state actor within the meaning of § 1983).

## C. Public Function

■ In order for a private actor to be deemed to have acted under color of state law, it is not enough to show that the private actor performed a public function. The plaintiff must show that the private entity assumed powers "traditionally *exclusively* reserved to the State." *Rodrigues v. Furtado,* 950 F.2d at 813 (citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974)) (emphasis added); *Blum,* 457 U.S. at 1005, 102 S.Ct. at 2786; *Rendell–Baker,* 457 U.S. at 842, 102 S.Ct. at 2772. The exclusive function test is related to situations where a state tries to escape its responsibilities by delegating them to private parties. *Johnson v. Pinkerton Academy,* 861 F.2d 335, 338 (1st Cir.1988). If the involuntary admission of patients is a traditional, exclusively sovereign function which has merely been delegated to a private actor, the state cannot escape responsibility for constitutional deprivations caused by private parties acting pursuant to the delegation. *Johnson,* 861 F.2d at 338; *see also West v. Atkins,* 487 U.S. 42, 55–56, 108 S.Ct. 2250, 2258–59, 101 L.Ed.2d 40 (1988) (physician to whom state has delegated its constitutional duty to provide adequate medical treatment to prisoners acts under color of state law). Because we find that the powers exercised by the Hospital in this case were not of the sort "traditionally the *exclusive* prerogative of the state," *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95

---

**3.** Section 12(a) provides in pertinent part:

Any physician who is licensed pursuant to section two of chapter one hundred and twelve or qualified psychiatric nurse mental health clinical specialist authorized to practice as such under regulations promulgated pursuant to the provisions of section eighty B of said chapter one hundred and twelve or qualified psychologist licensed pursuant to sections one hundred and eighteen to one hundred and twenty-nine, inclusive of said chapter one hundred and

twelve, who after examining a person has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness *may* restrain or authorize the restraint of such person and apply for the hospitalization of such person for a ten day period at a public facility or at a private facility authorized for such purposes by the department. . . .

(emphasis added) Mass.Gen.L. ch. 123, § 12(a) (1993).

S.Ct. 449, 455, 42 L.Ed.2d 477 (1974) (emphasis added), we find that it was not performing a public function.

The history of the involuntary treatment of the mentally ill in Massachusetts demonstrates that involuntary treatment has by no means been the exclusive prerogative of the State. During the Colonial era, treatment of the mentally ill was almost exclusively private. In 1800, there were essentially only three options for caring for the mentally ill: (1) a family or guardian paid for the mentally ill individual's boarding at a private "madhouse," or placed the individual with physicians and clergymen who cared for the mentally ill in their homes; (2) the family kept the mentally ill person at home; or (3) if the patient escaped and wandered into a strange town, responsibility for care rested with the community where the individual resided or, in the case of a stranger, with the Commonwealth. Sutton, S.B., Crossroads in Psychiatry: A History of the McLean Hospital 6–9 (1986). An insane person who could not be controlled by family or friends became a social problem, customarily resolved by placement in an almshouse. *Id.* at 8–9.

From the early 1800's until the Civil War, private citizens could freely admit mentally ill relatives to both public and private[4] psychiatric facilities. Nineteenth century Massachusetts legislative enactments dealing with the mentally ill acknowledged the use of private institutions to care for the mentally ill with virtually no involvement by the state in the decision of whether to admit a person to an institution.

Historically, Massachusetts legislative enactments have also had different requirements for the involuntary "commitment" and "admission" of mentally ill persons to institutions for their care. While "commitment"

required action by a judge, and therefore, some state involvement in the process, "admission" seems to have been left entirely to the discretion of the person seeking admission of the mentally ill person and the institution receiving the person into its care. For example, a 1909 statute distinguished between requirements for the "commitment" of a patient and the requirements for the "admission" of a patient. Mass.Gen.L. ch. 504, §§ 30, 42 (1909). Commitment to any hospital or "receptacle for the insane," public or private, required a certificate of insanity to be filed with a judge by two physicians as well as an order by the judge with findings by the judge that the person subject to be committed was insane. Mass.Gen.L. ch. 504, § 42 (1909). For temporary emergency admission, however, the 1909 statute did not require conformance with the judicial procedures required for commitment. *Id.; see also* Mass.Gen.L. ch. 504, § 30 (1909) (setting forth judicial commitment procedures). By its terms, the statute permitted an immediate temporary admission to a hospital in cases of emergency without any involvement of a court. Mass.Gen.L. ch. 504, § 42 (1909).

Precursors to the modern Chapter 123, § 12, which were enacted in 1881, 1909, and 1932, authorized any institution for the insane, public or private, without order of a court, to admit for five days any person whose case was certified by two physicians to be one of violent and dangerous insanity or an emergency.[5] Mass.Gen.L. ch. 272, § 1 (1881); Mass.Gen.L. ch. 504, § 42 (1909); Mass.Gen.L. ch. 123, §§ 78–79 (1932). As late as 1932, the temporary care provision permitted any institution for the insane, public or private, to temporarily admit a mentally deranged person when requested by a physician in writing. Mass.Gen.L. ch. 123,

---

4. For example, an 1862 statute provides that:

    Upon every application for admission of an insane person to the several state lunatic hospitals or to *any asylum or private house* for the reception of the insane, the applicant shall file with his application a certificate, signed by two respectable physicians ... certifying ... to the insanity of the person in whose behalf admission is sought, and that such person is a fit subject for remedial treatment such hospital, asylum, or private house.

Mass.Gen.L. ch. 223, § 8 (1862) (emphasis added).

5. As of 1909, the statutes required that the physicians be registered graduates of medical school who had been in practice three years and that the physician examine the patient within five days of signing the certificate, that he state the patient was insane and a proper subject for treatment in a hospital for the insane, and that he set forth the facts on which his opinion was based. Mass.Gen.L. ch. 504, § 32 (1909).

§ 79 (1932). The physician was not required to have any particular credentials and was not required to provide any certificate of insanity. Thus, temporary admissions of the mentally ill could be effected with only private persons and institutions participating in the process. Mass.Gen.L. ch. 123, §§ 78–79 (1932).

Although subsequent statutes narrowed the group of persons who could recommend commitment and increased the role of judges in their selection and in the approval of their decisions,[6] the temporary emergency admission provision remained essentially the same up through the time of the enactment in 1970 of Chapter 123, § 12, of the emergency provision pursuant to which Rockwell was admitted to Cape Cod Hospital.

Contrary to Rockwell's assertions, at no time has Massachusetts legislation required persons seeking the admission of a patient to a psychiatric facility to obtain a court order for the "admission" of insane persons. Likewise, there has never been a requirement that the admission be to a public hospital or that certifying doctors be state employees. Private citizens and private physicians from the turn of the century up to the present day have been able to arrange for the admission of mentally ill patients to private hospitals under both emergency care and/or temporary care provisions.

The history of involuntary admission of the mentally ill to facilities for their care shows that involuntary admission is not a traditional, exclusively sovereign function. On the contrary, caring for the mentally ill, including their involuntary confinement, has historically been a predominantly private function, in which regulation and involvement by the state is a recent phenomenon.

### Claims Against Dr. Corr and Dr. Ianzato

The remaining appellees, doctors Corr and Ianzato are persons acting in a private capac-

ity; they are both private physicians unaffiliated with a state institution. Application of the same three-test analysis we applied to the Hospital mandates the same conclusion when applied in the context of these private individuals: there was no state action. *Harvey,* 949 F.2d at 1133.

Doctors Corr and Ianzato are clearly entitled to prevail, hence, we need not decide whether the district court correctly held that Dr. Corr is entitled to qualified immunity.

### Pro se Complaint

■ When a *pro se* complaint sets forth the facts upon which relief is sought, and a lenient construction demonstrates beyond doubt that the plaintiff can prove no set of facts to support her claim for relief, the complaint will be subject to dismissal pursuant to Fed.R.Civ.P. 12(b)(6). *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 (affirming dismissal of *pro se* complaint where detailed description of medical treatment demonstrated that the defendants did not violate the plaintiff's Eighth Amendment rights). We have closely examined Rockwell's complaint and amended complaint. Her amended complaint sets forth with great detail the specific circumstances and facts upon which she based her claims for relief pursuant to 42 U.S.C. § 1983. The amended complaint was sufficiently detailed so as to permit the district court properly to conclude that no set of facts existed upon which Rockwell could base her claims. Rockwell's failure to state a claim could not be cured by amendment. *See Reynoldson v. Shillinger,* 907 F.2d 124, 126 (10th Cir.1990) (dismissal with leave to amend only if possible for the plaintiff to correct defect in pleading or state a claim for relief); *Karim–Panahi v. Los Angeles Police Department,* 839 F.2d 621, 623 (9th Cir.1988) (leave to amend not necessary where it is clear deficiencies of complaint could not be cured by amendment). Rockwell could not allege sufficient facts to demonstrate that

---

**6.** For example, a 1941 Act required a judge, if he believed it practicable, to have one of the physicians providing a certificate of insanity in commitment proceedings be a psychiatrist. Mass. Gen.L. ch. 645, § 1 (1941).

A 1956 statute required the Department of Mental Health to provide to courts a list of psy-

chiatrists practicing in Massachusetts which could be used by the courts for their guidance in selecting physicians for examinations in commitment proceedings. Mass.Gen.L. ch. 589, § 3 (1956).

doctors Corr and Ianzato, or the Hospital, acted under color of state law. Therefore, the amended complaint was properly dismissed.

*Affirmed.*