**Mercedes PASTRANA, Plaintiff**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

**Civil No. 95–1493(PG).**

United States District Court,
D. Puerto Rico.

Feb. 15, 1996.

Paul Ramos Morales, San Juan, P.R., for plaintiff.

María Hortensia Ríos, Asst. U.S. Attorney, Hato Rey, P.R., for defendant.

### *OPINION AND ORDER*

PEREZ–GIMENEZ, District Judge.

■ "Applicants for social security disability payments, most of whom are truly ill or disabled, are entitled to be treated with respect and dignity no matter what the merits of their respective claims." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995). Mercedes Pastrana, the plaintiff in this case, was not accorded the respect and dignity that was her due during her hearing before a social security Administrative Law Judge (ALJ). Furthermore, the ALJ's statements and conduct at the hearing suggest that Pastrana did not receive a fair hearing before an impartial ALJ.[1] The Court, therefore, **REMANDS** this case for a new hearing before another ALJ.

### I.

This case began almost eight years ago, in July 1988, when Pastrana first applied for disability benefits. She claimed an inability to work due to back and heart pain, and "nerves." She alleged an onset date of July 1980. After her application was denied both initially and upon reconsideration, a hearing was held before an ALJ, who found that she was not under a disability as defined by the Social Security Act. Rec. at 14–18. On January 8, 1990, the Appeals Council denied her request for review, thereby making the ALJ's decision final, subject to review by this Court. Rec. at 3–4. 42 U.S.C. § 405(g).

■ Judge Laffitte of this district found that the state of the record necessitated remanding the case to the Secretary (now Commissioner) because "the ALJ erred in reaching his conclusion on [Pastrana's] claims of pain." *Pastrana v. Sec. of H.H.S.*, slip opinion of February 2, 1993, Civil No. 90–1180 (HL), at 3. Rec. at 536–39. Specifically, the Court found that the ALJ failed to apply the teachings of *Avery v. Sec. of H.H.S.*, 797 F.2d 19, 23 (1st Cir.1986). *Avery* requires that ALJs make a thorough inquiry into a claimant's prior work record, daily activities, functional restrictions, and medications, as they relate to the claimant's subjective complaints of pain. The Court found that the ALJ "did not make a proper assessment under the guidelines set forth in *Avery* and its progeny," and remanded the case to the Social Security Administration (SSA) for additional proceedings.

Pursuant to social security regulations, Pastrana's claim was returned to the same ALJ who conducted the first hearing. Rec. at 353–54. After holding the hearing that is the subject of this Opinion and Order, the ALJ issued a decision affirming his earlier denial. The ALJ found that Pastrana's claim was not supported by substantial evidence. Rec. at 277–89. The Appeals Council denied review, and the decision thereupon became final. Rec. at 256–57. Pastrana is again before this Court contesting the Commissioner's decision, pursuant to 42 U.S.C. § 405(g).

### II.

■ It is not a cliché, but an essential component of civil society, that parties are "entitled to the cold neutrality of an impartial judge." *United States v. Orbiz*, 366 F.Supp. 628, 629 (D.P.R.1973); *Johnson v. Mississippi*, 403 U.S. 212, 216, 91 S.Ct. 1778, 1780, 29 L.Ed.2d 423 (1971) ("Trial before an unbiased judge is essential to due process"). This rule applies both to administrative and judicial proceedings. *Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). Indeed, the absence of

---

**1.** After some deliberation, the Court has chosen not to refer to the ALJ by name. It is unfortunate that the ALJ did not show the same consideration while making the *ad hominem* attacks on the people he cited by name during the hearing that is the subject of this opinion.

the sorts of procedural safeguards in the administrative process that are found in judicial proceedings has been recognized as a grounds for even stricter application of the requirement that administrative adjudicators be impartial. *NLRB v. Phelps*, 136 F.2d 562, 563–64 (5th Cir.1943).

Recognizing the need for safeguarding the fairness of its administrative adjudications, SSA regulations forbid "[a]n administrative law judge ... [from] conduct[ing] a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending...." 20 C.F.R. § 416.1440 (1995).

■ This regulation is similar to the law governing disqualification for Article III judges. 28 U.S.C. § 455. Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In the First Circuit, the issue of disqualification turns on

> whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of a reasonable man.

*Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1460 (1st Cir. 1992). This objective standard governs "despite the lack of any actual bias on the judge's part." *In re Cargill, Inc.*, 66 F.3d 1256, 1260 n. 4 (1st Cir.1995). Thus, unlike claims alleging, for example, the ineffective assistance of counsel, there is no "prejudice prong" to the analysis of claims involving a biased judge. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (claims of ineffective assistance of counsel must show both deficient performance along with resulting prejudice to the party's case). A judge must disqualify himself when he might be perceived as biased, and the perception of bias is grounds for a reviewing court to vacate the judgment below.

## III.

This case was originally referred to a Magistrate Judge who recommended affirming the Commissioner's denial of Pastrana's claim. This recommendation came in spite of the Magistrate's noting that "the presiding ALJ ... engaged in a plethora of innuendos and a campaign of discredit against the remanding judge, examining physicians and treating doctors displaying a total lack of objective consideration of the evidence and claimant's attempt to establish pain since onset date of alleged disability" [sic]. Although the Magistrate "found it extremely hard to separate the [ALJ's] personal and biased comments from the necessary and appropriate inquiry the ALJ must carry," the Magistrate decided that the ALJ's written opinion compensated for the ALJ's clearly biased approach to Pastrana's claim. The Court does not believe, however, that the two can be so easily separated. Furthermore, as the discussion in Part II of this opinion demonstrates, the law does not require, nor permit, making such a separation.

The ALJ's approach was apparently based on a cramped reading of the Social Security Act. Under 42 U.S.C. § 405(b)(1), the Commissioner is directed to "make findings of fact, and decisions as to the rights of any individual applying for a payment." The Commissioner's decisions are subject to judicial review under 42 U.S.C. § 405(g), but the scope of that review is circumscribed to assessing whether the Secretary's decision is "supported by substantial evidence." If a district court rejects a finding pursuant to this standard, § 405(g) authorizes the court to "... modify[ ], or reverse the decision of the Secretary, with or without remanding the cause for a rehearing."

■ Thus, the Magistrate's approach to this case—a conventional "supported by substantial evidence" review—essentially amounted to treating the ALJ's bias as "harmless error." However, even if the record was entirely devoid of any evidence which might support a finding of disability, there is good reason not to apply a "harmless error" standard to claims of ALJ bias. *See Hummel v. Heckler*, 736 F.2d 91, 95 (3rd Cir.1984). SSA ALJs wear the "dual hats"

of investigator *and* adjudicator. An ALJ has an affirmative obligation to assist the claimant in developing the facts of his or her claim, but must also critically assess that claim, as well as decide it. 20 C.F.R. § 404.929, et seq. "It is difficult to conceive of how a judge biased against disability claims or claimants could conscientiously perform ..." those multiple duties. *Hummel,* 736 F.2d at 95.

In fact, though the reasoning may seem circular, it is the perceived neutrality and fairness of the SSA system that permits its continued existence. In *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Supreme Court rejected a claim that the combination of functions assigned an SSA ALJ constituted a due process violation:

> Neither are we persuaded by the advocate-judge-multiple-hat suggestion. It assumes too much and would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity. The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing facts. The 44.2% reversal rate for all federal disability hearings in cases where the state agency does not grant benefits attests to the fairness of the system and refutes the implication of impropriety.

*Id.* at 410, 91 S.Ct. at 1432. Accordingly, when an ALJ's fairness is questioned, the presumption of constitutionality must fail as well. In such circumstances, "it is the conduct of the hearing, not the content of the evidence, which is the subject ..." of a court's focus on § 405(g) review. *Ventura v. Shalala,* 55 F.3d 900, 901 (3rd Cir.1995). All that need be demonstrated is that, based on the record, an objective person might believe the ALJ was biased against Pastrana's claim. She need not make the additional showing that she would have prevailed but-for the judge's bias.[2]

Review of the record here suggests that the ALJ harbored at least three distinct biases against Pastrana's claim for disability benefits. First, it appears that the ALJ resented the district court's remand order, and expressed unwillingness to apply the appropriate legal standard. Second, the record suggests that the ALJ was biased against Pastrana's treating psychiatrist. Third, the ALJ's statements indicate a bias against Disability Insurance applicants from Puerto Rico, as a general class. Because of these biases, this case must be remanded to the Commissioner for a rehearing.

## IV.

### a. Hostility to the Remanding Judge

As the Supreme Court has observed, being reversed is inevitable in our hierarchical judicial system:

> Whenever decisions of one court are reviewed by another, a percentage of them are reversed. That reflects a difference in outlook normally found between personnel comprising different courts. However, re-

---

**2.** It is true that Pastrana's complaint does not advance the issue of the ALJ's bias. The Court has raised and decided the issue *sua sponte,* without the benefit of the government's response. Several considerations support doing so. First, Pastrana is proceeding *in forma pauperis.* Though the attorney who has represented her throughout this lengthy process is nominally doing so here, the complaint document is a "standard form" used by her attorney's office, personalized for Pastrana's claim only by the placement of her name and address in the appropriate blank spaces. There is very little difference between her complaint, though filed by an attorney, and one that a *pro se* litigant might have filed. Just as the Court must liberally construe a *pro se* complaint, *Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 255 (1st Cir.1994), the Court is inclined to do the same here.

Second, Pastrana actually did raise the issue to the Appeals Council, which, as discussed later in this opinion, disposed of it in an inadequate and perfunctory manner. Thus, the government was not entirely without notice that this issue was "lurking in the record."

Third, and most important, is the ALJ's appalling behavior at the hearing. "Where a defense substantially implicates important nonjurisdictional concerns that transcend the interests of the parties to an action, a court may raise the defense *sua sponte." Hines v. United States,* 971 F.2d 506, 508 (10th Cir.1992). The importance of assuring the fair administration of the social security system is a sufficiently important concern to justify the Court's *sua sponte* consideration of the ALJ's bias.

versal by a higher court is not proof that justice is thereby better done. There is no doubt that if there were a super-Supreme Court, a substantial proportion of our reversals of state courts would also be reversed. We are not final because we are infallible, but we are infallible only because we are final.

*Brown v. Allen,* 344 U.S. 443, 540, 73 S.Ct. 397, 427, 97 L.Ed. 469 (1953) (Jackson, J., concurring). Justice Jackson's words suggest that judges should accept the process of appellate review with equanimity.

The ALJ in this case, however, appears to have taken the district court's remand order as a personal affront. "[T]he problem with this case is that—this is a remand from the Federal Court and it says—basically, they returned this case because of the *Avery* case." Rec. at 292. The ALJ said this not more than a minute into the hearing, thus setting the tone for what was to follow. The difficulty with applying *Avery,* the ALJ asserted, is that it requires use of one's "spiritual abilities:"

> I do have my spiritual skills, but I do not use them in Social Security cases, and I do not think that the Federal Court will be pleased if I use my spiritual abilities to go back in the past and I do not think that they would like me to see the future either—because the predictions for the future would not be to their liking either.
>
> . . . .
>
> [W]ith due respect to the Federal Judge—unless the Federal Judge concludes that everything that people say must be believed in regard to pain and that the *Avery* decision means that: that we Judges give up our right to take into consideration the credibility part; to make decision[s] based on credibility—our right to make decision[s] without giving credibility to the claimant is taken away and complaints of pain are to be accepted even when the objective evidence is negative—benefits would have to be approved for anyone who asked for them.

Rec. at 293, 300. The Court admits that the ALJ's meaning is not entirely clear. (It may have suffered during the translation from the original spanish.) His statements do, however-er, reflect hostility toward applying *Avery,* if not an outright misunderstanding of the *Avery* standard. The Court also detects a menacing note in the ALJ's "predictions for the future."

The statements quoted above provide one-half of the necessary context for the following. The next statement was made as the conclusion to what can only be described as a diatribe against the "work ethic" of the people of Puerto Rico. This diatribe is recounted in its full, inglorious detail later in this opinion. At this point, however, for the purpose of fully appreciating the following, all that need be recognized is that they were preceded by numerous unflattering comparisons between the "Puerto Rican work ethic," and that prevailing in the United States:

> In the United States this type of claim is not very common, except for Puerto Ricans. There are people who do not believe that I should be putting Puerto Rico down. I am Puerto Rican and I have a "Puerto Rican Flaw" and it is that I drive in a Puerto Rican style and we Puerto Ricans drive terribly. I have to become civilized when I visit the United States. I have to drive in a civilized manner because we drive badly. We have to learn to adapt to the way of driving there. But there are *Avery* cases as Judge [Inaudible] said, *Avery* did not think that Puerto Rico existed. If the Federal Court here has some judges that are stricter, like Judge Laffitte, then, I would like to see a court of [a]ppeals telling him that "from now on you have to do everything that you are told and if you do not believe that you are told you are a bad Judge and we will revoke you" just see how he feels and how long he stays there or if he returns to the law office of Laffitte.

Rec. at 307–08.

This is, admittedly, not entirely comprehensible. The Court takes its meaning to be as follows: The *Avery* case was not decided with Puerto Rico in mind. *Avery,* the ALJ asserted, should not be strictly applied to Puerto Rican applicants for disability benefits because the typical Puerto Rican's work ethic is not comparable to the average worker in the United States. (This asserted lack

of comparability between the "United States" and Puerto Rico, the Court takes it, is the point of the ALJ's bizarre comparison between Puerto Rican and state-side driving styles.) The ALJ would apparently like to see the Court of Appeals instruct district court judges, such as Judge Laffitte, in the correct application of *Avery*—at least in the manner that it should be applied in Puerto Rico. If the district court judges are recalcitrant—i.e., apply Avery too strictly—the ALJ would like to see them "revoked" (spanish for "reversed" is "revoco"). The ALJ apparently believes that frequent reversals will persuade judges such as Judge Laffitte to return to the private practice of law.

The Court will not dwell on the shocking nature of these statements. All that need be addressed are their legal implications. The statements herein quoted suggest that the ALJ both resented having to review this case a second time, as well as his disagreement with—if not his outright unwillingness to apply—the legal standard controlling Pastrana's claim. Therefore, a reasonable person could believe that the ALJ was not capable of fairly adjudicating Pastrana's claim.

### b. The ALJ's Bias Against Pastrana's Treating Psychiatrist

 Near the conclusion of the hearing, the ALJ made the following derogatory statements about one of the examining physicians, whose findings are part of the record of Pastrana's claim:

> The doctor [name deleted for privacy considerations] who had lunch with me everyday for many years. We got along well at the personal level, but at a professional level I considered him to be very bad, and I would express it and he knows that I thought that way about him. He admits it himself. He studied psychiatry because he does not know English and the only way for him to practice in Puerto Rico was as a psychiatrist because he did not even know the effects of the medication, and he was afraid to practice internal medicine because he could kill somebody, but not so as a psychiatrist. Dr. [name deleted]—he believed that the state was bent on mentally disabling the greatest number of people

and that was the philosophy and according to him it was the same thing in Spain. I did not know that.

Rec. at 315.

This doctor who the ALJ holds in such high esteem examined Pastrana in February 1983. He made numerous findings favorable to her claim. Rec. at 464. A claimant's record may, of course, contain conflicting medical diagnoses. It is the ALJ's responsibility to weigh this evidence and determine whether the claim is supported by substantial evidence. *See* 20 C.F.R. 404.944–.961. Had the ALJ acknowledged the medical report at issue here, and found it not credible in light of the weight of conflicting evidence in the record, the ALJ would have been doing his job. Here, however, the ALJ appears to have had preconceived ideas about this particular physician's competence that precluded him from objectively judging the report.

Pastrana's petition to the Appeals Council specifically cited the ALJ's bias toward her treating psychiatrist. Rec. at 272, 258. The Appeals Council responded as follows:

> Your representative also alleges that the Administrative Law Judge made prejudicial comments of your treating psychiatrist, [name deleted]. The Appeals Council does not find any evidence that you were treated or examined by the psychiatrist in question. Furthermore, his comments were done within the context of his friendship with the physician in question and were not a reflection of the issues in the case.

Rec. at 256.

Two aspects of this response strike the Court as incredible. First, at page 464 of the record provided to this Court by the SSA, there is a photocopy of a 1983 report by the doctor in question detailing the doctor's findings from his examination of Pastrana. This strikes the Court as nearly conclusive evidence that Pastrana was, in fact, treated by the psychiatrist in question. If there is some problem with this evidence, it needs some explanation.

Second, it is this Court's view that the ALJ's statements exhibit bias, and that they do, in fact, reflect on the issues in this case.

This may simply be a "reflect[ion of] a difference in outlook" between the Appeals Council and this Court. *Brown v. Allen, supra.* Nonetheless, the Court finds that the record suggests that the ALJ's bias against Pastrana's treating physician could lead a reasonable person to doubt whether the ALJ was capable of fairly evaluating all the evidence in the record, and further suggests that he should have recused himself.[3]

### c. The ALJ's Bias Against Puerto Rican Applicants for Disability Benefits

This last aspect of the case is, perhaps, the most disturbing. If the ALJ's biases were limited to just those cases heard on remand from Judge Laffitte, or to those claims containing the medical reports of a particular physician or specialty, the ALJ could continue in his role as a social security ALJ in the vast majority of cases presented for his review. However, the ALJ lives and works in Puerto Rico and, the Court assumes, the vast majority of his workload involves Puerto Ricans. If he is, indeed, biased against Puerto Rican claimants, as the following suggests, this Court wonders how he can continue in his current position.

The following quotations are excerpted essentially verbatim from the record, interrupted by the Court only for purposes of narrative flow:

> Compared to Somalia, the poor people here are millionaires and compared to how peopled lived in Puerto Rico 50 years ago, a person who is in the poorest condition today could be considered a millionaire. Here for a person not to be poor, they will have to give a Mercedes Benz to each person, a mansion on the beach or on a mountain with a beautiful view and air conditioning. Here one cannot find a person willing to do housework, one has to bring someone from the Dominican Republic, because Puerto Ricans consider that type of work to be undignified. One cannot find a male person who does farm work because that is considered undignified. But that is work ... However, there is a 20% unemployment level. So let's not talk about poverty in Puerto Rico because here you are poor only if you do not want to work.
>
> ....
>
> Here there are more than 100,000 people from the Dominican Republic who are illegal and who come here in rafts taking a chance with the sharks to come to work here. They are paid less than Puerto Ricans and they work. And despite all of those positions that they hold—look, Puerto Ricans do not even want to work as mechanics anymore because they get dirty. There aren't shoe shining boys who are Puerto Rican. Where can you find shoeshiners? Before, you could find them all over the place. Now we do not find any Puerto Rican shoe-shiners. Last night I spent one—two hours shining my shoes because nobody goes around cleaning shoes anymore.

Rec. at 304–05. At this point, Pastrana's attorney interrupted the ALJ's musings to inform him that "right across the street" from where the hearing was taking place, there was a shoe shiner at work. To this, the ALJ responded:

> Miñeco, but you have to put up with his stories and I would rather not listen to Miñeco. Miñeco is a nice guy—He tells you some stories—Well, basically, when I am here, I do not like that. But I like to shine my shoes. I have no problem with that. I was in a military school and in the army where they made me clean my boots; they had to shine, one had to be able to see one's reflection on them, to see one's face. I have no problem with that. I could work cleaning shoes.

Rec. at 305. Although the Court sympathizes with the ALJ's desire to have his shoes shined in peace, it is also difficult not to sympathize with the claimant and her attor-

---

3. Although not entirely germane, other statements by the ALJ exhibit bias toward various medical specialties, particularly neurologists. ("The neurologist does not cure anybody, except in epilepsy, when they prescribe Dilantin—that is when they do something useful." Rec. at 303.)

This attack on neurologists was repeated later in the hearing, along with a personal jab at Pastrana's attorney: "The only thing neurologists do is establish diagnoses for disability purposes. That is why you like them a lot." Rec. at 316.

ney, who were forced to listen to the ALJ's stories about his days in the military and his views on Puerto Rican society.

Unfortunately, the ALJ was not finished: The problem is that th[e] job [performed by Pastrana during which she was allegedly injured] was cumbersome; it was an uncomfortable job; it was hot: there was no air conditioner there. That is another thing. People do not want to work in a factory where there isn't any air conditioning anymore. Because the pharmaceutical companies have air conditioning and the electronic factories have air conditioning, people no longer want to work where there is no air conditioning. That is it. That is the way it is. And it is easy for a Federal Court to say that we are going to force everybody to install air conditioners. I hope they do. That would not be as bad as saying that we are going to give disability benefits because people just do not want to work or that at age 50 people do not want to work. I point that out constantly. I go to the United States and to the airports and to the hotels and most of the ladies who clean the rooms and who pick up the trash in the airports and hotels—the people who pick up the butts; well, not the butts because people cannot smoke inside the airports; but they are people who are older than 50 and 60 and even 70 years of age. Go around here and see if you find a 70 year old person who is working. After 50 years of age they want to get Social Security and those are things that I am aware of because that is my job here. I see that. I notice that. You see more elderly people working lately than before. Why? I do not know. Maybe, there is more work available. But—maybe because I have pointed that out so much people have learned.

Rec. at 306–07. Of the many worthy candidates, this last is, perhaps, the most astounding passage in the entire hearing transcript. In it, the ALJ manages to combine his contempt for the claimant, the typical Puerto Rican worker, and the federal courts. He then adds his distorted, idyllic views of the U.S. labor force. He concludes, however, on a positive note, observing that things seem to be improving. And who does he credit for this improvement? Why, himself, of course. After all his many lectures on the subject of disability in Puerto Rico—presumably to captive audiences such as Pastrana and her attorney—the public is finally paying attention and working harder!

The Court finds that these statements evince a bias against Puerto Rican applicants for disability benefits. This bias suggests that the ALJ may have been unable to judge Pastrana's claim in a fair, impartial manner.

## V.

A case such as this leaves the Court in a quandary. The record unequivocally supports remand. In this instance, however, a simple remand seems insufficient. Based on the length of the transcript, the Court estimates that almost 10 minutes of the one hour hearing was taken up by the ALJ's disgusting, and often racist rantings.[4] The Court believes the ALJ should be held accountable for his conduct. Therefore, in addition to condemning in the strongest manner possible the ALJ's statements and conduct, the Court will forward a copy of this Opinion and Order, along with a transcript of the hearing, to both the Commissioner of Social Security and to the Director of the Office of Hearings and Appeals. Although the Court is aware of the difficulty the SSA has had exercising management control over ALJs, *see* II Davis & Pierce, *Administrative Law Treatise*, 3rd. ed., § 9.10 at 105–13, it is nonetheless this Court's hope that appropriate disciplinary action will be taken against the ALJ in this case.

Therefore, for the reasons stated herein, plaintiff's petition to have this case **RE-MANDED** to the Commissioner for a rehear-

---

4. For the reader who questions whether the ALJ's statements can be characterized as racist, *see Franceschi v. Hyatt Corp.*, 782 F.Supp. 712, 724 (D.P.R.1992) (holding "that Puerto Ricans constitute a race or ethnic group for purposes of [42 U.S.C.] § 1981" claims of race discrimination).

ing is **GRANTED.** This hearing must be held before a different ALJ.

**IT IS SO ORDERED.**