607 So.2d 30 (1992)
Lisa Stevens LEE
v.
Morris ALEXANDER, M.A.; Greenwood Leflore Hospital; Region VI Mental Health Center; William D. Jones, M.D.; Robert L. McKinley, Jr., M.D. and St. Dominic-Jackson Memorial Hospital.
No. 89-CA-0459.
Supreme Court of Mississippi.
June 3, 1992.
As Modified on Denial of Rehearing August 26, 1992.
C. Victor Welsh, III, Crymes G. Pittman, Cothren & Pittman, Jackson, David C. Owen, Columbus, for appellant.
Chris J. Walker, William Reeves, Markow Walker Reeves & Anderson, Albert B. White, Stephen P. Kruger, Upshaw Williams Biggers Page & Kruger, Jackson, Lonnie D. Bailey, Upshaw Williams Biggers Page & Kruger, Greenwood, Mark P. Caraway, George Q. Evans, Wise, Carter Child & Caraway, Christopher A. Shapley, John E. Wade, Jr., Brunini Grantham Grower & Hewes, Jackson, for appellee.
Michael C. Moore, Atty. Gen., Ed Davis Noble, Jr., Sp. Asst. Atty. Gen., R. Mark Hodges, Wise Carter Child & Caraway, Jackson, for amicus curiae.
*31 Before ROY NOBLE LEE, C.J., and PRATHER and SULLIVAN, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Lisa Stevens Lee filed her complaint in the Circuit Court of Hinds County, First Judicial District, on May 26, 1987, against Morris Alexander, M.D., et al., for negligent diagnosis and treatment and for false imprisonment. All defendants moved for summary judgment and the plaintiff, likewise, moved for summary judgment against all defendants on the issue of liability. The lower court granted the motions of Jones, McKinley and St. Dominic-Jackson Memorial Hospital on November 25, 1988. The lower court granted the motion of Greenwood-Leflore Hospital on January 4, 1989 and the motion of Alexander on February 13, 1989. From those summary judgments, Lisa Lee appeals.

FACTS
Lisa Lee presents a complex and emotional saga to this Court. The specific conduct she complains of began with her voluntary admission to the Greenwood-Leflore Hospital on May 26, 1986. She entered the hospital under the care of Dr. S.R. Evans, her gynecologist. She had gone to Dr. Evans' office because of a number of stressful events occurring in her life and their effect on her health. Dr. Evans advised her that he could either give her some drugs to help with the stress or put her in the hospital for rest. She chose the latter course, which led to the actions by the defendants on which Lee's complaint is based.
For a proper perspective on Lee's condition, the course of her life for several years before this hospitalization is relevant. Lisa Lee was born in 1964. She graduated from high school in 1982 and then continued her education in a vocational-technical program, receiving training in word processing. She found a job with Gulfco Finance in Greenwood, and worked there from October of 1984 until the time of her hospitalization. In June of 1983, she was married to Keith Stevens, whose father was Chief of Police in Greenwood. She and Keith had one child during their marriage of about two (2) years. In December of 1985, Lee and Keith divorced, and the chancery court granted her custody of their young son. Lee testified at her deposition that her family and Keith Stevens' family exerted a great deal of pressure on her during the divorce proceedings, since neither family wanted the divorce. The reasons for the divorce, Lee stated, were that her husband was having an affair with a woman with whom he worked and that he did not spend enough time at home with their child.
In January of 1986, she began seeing Joe Lee, a man she met when he came into her office. She became pregnant by Joe and decided to have an abortion, which was performed by Dr. Gunter in Columbus during April. According to Lee, she received no counseling either before or after the abortion from Dr. Gunter's office, which contributed greatly to her deteriorating mental condition. Further complicating her life at this point were several other problems: an audit at Gulfco, an illness which her child was suffering and continued pressure from her parents and her former in-laws, including a threatened custody suit over her son.
Lee had reached a near-breaking point on May 26 when she went to Dr. Evans' office. According to her own testimony, she had developed poor eating habits and could not sleep. She stated that she told Dr. Evans she needed rest and relaxation to help her get back on her feet. Dr. Evans' own notes show his perception of Lee's condition on that day:
The patient looks like she is sedated or overdosed. I am not sure what is going on. I can't make heads or tails out of what has happen [sic] since October 1985 when she had an abnormal pap. She did not come back here. She had a positive culture for herpes at that point. Her partner is also with her today. He states that she is under a lot of pressure from her job, family, et.[sic] I plan to admit her today.
He further noted that Lee vomited at the mention of her mother. Dr. Evans did *32 admit her to Greenwood-Leflore Hospital on that day. Lee told Dr. Evans that she only wanted to stay in the hospital for three days. She went to the hospital with Joe Lee, who assisted her in filling out the hospital admission forms. Dr. Evans attempted to examine her after her admission to the hospital, but she refused to allow him to examine her. Dr. Evans then decided to consult with the Regional Mental Health Center.
Thus entered Morris Alexander, M.A. (now Ph.D) into the picture. Alexander went to the hospital as an employee of the Mental Health Center on May 26 and attempted to speak with Lee. His notes from that session reflect that Lee initially answered his questions, but then withdrew and refused to speak with him. He then spoke with Joe Lee, who related the history of Lee's problems substantially as set out above. Alexander met with Lee again on May 27 and 28, and his notes seem to reflect progress in his relationship with her and her general state of mind.
Although Lee did not want her parents to find out that she was in the hospital, at some point they did learn about it and, depending on the perspective, either rushed to her aid or intruded where they were unwanted and only an unneeded complication. The parents consulted their own doctor, Dr. William D. Jones, about Lee's condition and asked Dr. Evans to allow Dr. Jones to take over Lee's care. Evans' notes on Lee's hospital chart from May 28 at 5:30 p.m. state, "Transfer to Dr. Jones' service (per request of family) if pt. agrees & Dr. Jones accepts." Jones did agree to take over Lee's care, as reflected on the chart just below Evans' notation. Dr. Evans contends in his affidavit that he told both Lisa and Joe Lee of the proposed change and that neither of them objected.
Lee stated that this was the point where things began going wrong. Her parents took control of the situation and Joe Lee, whom she felt to be her "protector" was no longer around. Her parents put a "No Visitors" sign on her hospital room door. They told Dr. Evans that Joe Lee had been giving her drugs. Lee stated that no one asked her about the change of doctors; that she did not know Dr. Jones; and that she objected to everyone in the hospital about the change. She further stated that she had told hospital personnel that she wanted to leave the hospital even before Dr. Jones took over.
Lee had been placed on medication when Dr. Evans admitted her to the hospital and Lee admitted that the medication affected her ability to perceive her own situation and her decision-making ability. Alexander met with Lee again on May 29. During the session, Lee told Alexander that she wanted to leave the hospital and she walked out of the hospital and into the parking lot wearing only her hospital gown. She admitted that at the time she was confused and believed that she still lived at a former residence near the hospital. She stated that she returned to the hospital and told them she wanted her clothes so that she could go home and that when she went back into the hospital, hospital personnel restrained her with a Posey belt. She became violent at that time, trying to get out of the restraints. Alexander's notes confirm that she walked out of the hospital and that security personnel returned her to her room. Jones' notation on the hospital chart that day relates that he was not having much success relating to Lee and that she tried to leave the hospital; he ordered use of a Posey belt, if needed, since the psychiatric room was occupied.
Dr. Evans' notes reflect that he ordered a drug screen on the 26th. However, when the drug screen actually was taken is unclear. The written report from Puckett Laboratory in Hattiesburg reflects that the sample was taken on May 23, which obviously is in error. The report also reflects that the sample was received in the laboratory on May 28 and reported on May 29. The report stated that the sample tested positive for phenobarbital, one of the drugs prescribed by Dr. Evans. The report also lists the drugs which the sample was tested for, and had asterisks next to four of the drugs; amphetamines, barbiturates, benzodiazepines and cocaine metabolite. The asterisks reflect that these drugs would be detected only if found at high levels.
*33 Apparently, Alexander misread the drug screen by interpreting the presence of the asterisks by the named drugs as a positive finding of that drug in the sample. Alexander told Dr. McKinley, a psychiatrist with the Regional Mental Health Center, of the test results as he read them. Subsequently, McKinley notified Dr. Guild at St. Dominic-Jackson that the test was positive for barbiturates, amphetamines, benzodiazepines and cocaine, as reflected on a nurses' notes from that hospitalization.
Alexander's notes on the 29th reflect for the first time that a move to a psychiatric facility was being contemplated. He stated that he would "contact Dr. Guild in Jackson re transfer." Lee contends that she was never consulted about being transferred to another facility. However, it is clear that as a result of consultations between Dr. Jones, Alexander and Dr. McKinley the decision was made to transfer Lee to the psychiatric care unit at St. Dominic-Jackson. On May 30, Lee was discharged from Greenwood-Leflore Hospital and taken to St. Dominic-Jackson. Lee stated that at the time of the transfer, she was on so much medication that she did not know what was happening. In fact, she stated that she thought that she was being taken home when her parents and former in-laws put her into the car. James Stevens, her former father-in-law, drove the car to Jackson.
According to the affidavit of Dr. Mary B. Wheatley, the doctor who examined Lee upon her admission to St. Dominic, her admitting diagnosis was acute psychosis and she ruled out drug psychosis. She stated that she ordered that either a member of the family or a sitter be with Lee at all times for her "safety, protection and welfare." Wheatley also ordered that Lee be put into seclusion for the same reasons.
Lee stated that when she arrived at St. Dominic, she was unaware of her surroundings because of the medication. Her mother signed the consent form for Lee's admission. The consent form contained a section to be used if a patient was unable to consent and consent was being given by another person; however, this section of the form was left blank. The admission form stated that the family thought she had been using drugs. The nurses' notes on that day reflect that Lee was admitted at 4:45 p.m. and that at 8:30 p.m., she told a nurse that she had left strict orders that her mother should not be allowed in the room. However, her mother was in the room, and would stay with Lee throughout her entire hospital stay. The nurses' notes reflect that at 9:05 p.m., Lee was escorted to a "seclusion room" with her mother's permission. The notes further reflect that at 9:45 p.m., Lee put her call light on and told the nurse, "I just only want to go home now," and that the nurse "explained that she has not been discharged."
She was still in the seclusion room the following day, May 31. Nurses' notes reflect that she was very hesitant about taking medication and that she put up some resistance when being returned to the seclusion room from a trip to the bathroom. She tried to leave the unit that day at approximately 5:45 p.m. while some of her family was visiting her, but the nurses' notes state that the family followed her without stopping her and "seemed relieved when I intervened & stopped her." She was once again returned to the seclusion room.
Lee apparently acquiesced in her treatment and did not attempt to leave or contravene the hospital's rules again until June 6, when the nurses' notes reflect that while her mother went to the bathroom, Lee went to the main unit and, when discovered, told the nurses that she was going to use the phone. The nurse quoted her, "... I was just going to call and let them know I am all right." Presumably, she was referring to Joe Lee, whom she had not seen or talked with since Dr. Jones took over her treatment. The nurses' notes reflect that on June 8, Lee again tried to call "that other man" as her mother stated, but that her mother had her hang up after she had spoken only one word.
Lee stated that she was never allowed to speak with the doctors at St. Dominic, that her mother always spoke with them. She *34 further stated that she asked to leave the hospital many times, but was never allowed. She also said that she was forced to take medicine when she did not want to.
Dr. Guild's discharge summary diagnosed Lee's illness as atypical psychosis. He noted that she had been treated while at St. Dominic with Haldol, Cogentin and Valium. Guild noted steady improvement during her stay, but felt that she should have stayed longer. He noted that the mother insisted that she was well and ready to go home.
Lee was released from St. Dominic on June 15, 1986. However, that was not the end of Lee's tribulations. Her father, Vincenzio Verderajme, signed an affidavit seeking commitment of Lee on June 16, 1986, stating as the reason that Lee was "hallucinating as a result of being drug [sic]. Is being brainwashed or masterminded by the guy she is dating." Dr. McKinley and Dr. Richard Sayner were appointed to examine Lee and they reported on June 17 that she was not in need of commitment; the petition was denied on July 2, 1986. Between those two dates, however, two things happened. She married Joe Lee on June 24 and she went to see Dr. Meek on June 26. She was once again admitted to Greenwood-Leflore Hospital on June 28, under the care of Dr. Meek, and stayed until July 2. During this stay, she was seen again by Alexander. Her parents were not allowed to see her during this visit, and Lee seemed much more pleased with the outcome.
When Lee had originally entered Greenwood-Leflore Hospital on May 26, she had intended for Joe Lee to take care of her son. However, when her parents found out that she was in the hospital, they took her son from Joe Lee and gave him to his father to care for temporarily. Lee has not had custody since. As a result of all of her problems, a custody suit was brought and permanent custody of the child was changed from Lee to Keith Stevens. Lee believed that a major reason the Chancellor changed the custody arrangement was because Keith Stevens was able to put on testimony that she had been in a psychiatric ward. Lee stated that she was fired from her job at Gulfco during June because she had thirty days of unexcused absences from work. She was taken back part time in August but then terminated again in February of 1987, she claimed, because of this lawsuit. Also, as a result of the actions of the defendants, Lee alleges, she has had comprehension problems and memory lapses.

DISCUSSION
The principle is well established that this Court will conduct a de novo review of the grant or denial of a motion for summary judgment. Short v. Columbus Rubber and Gasket Co., 535 So.2d 61, 63 (Miss. 1988). The standard for the trial court and this Court to use under Rule 56 of the Mississippi Rules of Civil Procedure was first set out in Brown v. Credit Center, Inc., 444 So.2d 358, 362 (Miss. 1983) where the Court said:
the trial court must review carefully all of the evidentiary matters before it  admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If in this view the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise the motion should be denied.
On motion for summary judgment, all doubt must be resolved in favor of the party against whom the motion is made as to whether or not there is a genuine issue of material fact, which may be developed through a full evidentiary trial.

ISSUES
The issues have been consolidated and reformed in order to address them as concisely as possible.

I. WHETHER MISS. CODE ANN. § 41-41-3 ALLOWS A PARENT TO CONSENT TO MENTAL TREATMENT WITHOUT THE NECESSITY OF A COMMITMENT HEARING UNDER MISS.CODE ANN §§ 41-21-63, et seq.?
*35 Jones, Greenwood-Leflore and St. Dominic all contend that the parental consent given pursuant to Miss. Code Ann. § 41-41-3 eviscerates any claim of false imprisonment by providing consent and that the procedures for involuntary commitment under Miss. Code Ann. §§ 41-21-63, et seq. do not apply in cases involving private hospitals. Lee contends that the parental consent given here is not valid since the consent was given in contravention of the involuntary commitment statutes and, that as a result, the actions of the defendants amounted to false imprisonment.
False imprisonment has only two elements: "detention of the plaintiff and the unlawfulness of such detention." Page v. Wiggins, 595 So.2d 1291 (Miss. 1992); Thornhill v. Wilson, 504 So.2d 1205, 1208 (Miss. 1987) (citing State For the Use of Powell v. Moore, 252 Miss. 471, 174 So.2d 352, 354 (1965); Hart v. Walker, 720 F.2d 1436, 1439 (5th Cir.1983)). The appellees' attack focused essentially on the element of unlawfulness. The lower court agreed with them that Miss. Code Ann. § 41-41-3 operated to destroy that element of the detention. That section reads, in part,
... any one of the following persons is authorized and empowered to consent, either orally or otherwise, to any surgical or medical treatment or procedures not prohibited by law which may be suggested, recommended, prescribed or directed by a duly licensed physician:
.....
(b) Any parent, whether an adult or a minor, for his minor child or for his adult child of unsound mind;
.....
In addition to its usual definitions, the phrase "unsound mind" shall also mean and include, for the purposes of sections 41-41-3 through 41-41-11, a state of mind during which the person affected is unable to understand and appreciate the consequences of the proposed surgical or medical treatment or procedures so as to intelligently determine whether or not to consent to the same, regardless of whether such state of mind is only temporary or has existed for an extended period of time or occurs or has occurred only intermittently and whether or not it is due to natural state, age, shock or anxiety, illness, injury, drugs or sedation, intoxication or other cause of whatever nature.
Miss. Code Ann. § 41-41-3 (1972 and Supp. 1991, eff. July 1, 1984).
Seemingly, if this statute is valid and applicable to this situation, there can be no claim of false imprisonment. However, Lee contends that the statute is inapplicable because it only authorizes consent where "not prohibited by law." According to Lee, her hospitalization was prohibited by law under Miss. Code Ann. § 41-21-61, et. seq. Lee contends that she was in fact committed against her will and that since the procedure for commitment was not followed, her detention was unlawful.
Section 41-21-63 states that, "No person, other than persons charged with crime, shall be committed to a public treatment facility except under the provisions of Sections 41-21-61 through XX-XX-XXX." The lower court found that private hospitals were not "public treatment facilities" under the statute, and that argument is urged by the appellees. "Public treatment facility" is not defined in Chapter 21, however, "treatment facility" is. It means "a hospital, community mental health center, or other institution qualified to provide care and treatment for mentally ill, mentally retarded, or chemically dependent persons." Miss. Code Ann. § 41-21-61(i) (Supp. 1991, eff. July 1, 1985).
The appellees urge that "public treatment facilities" are only those owned by the State. In support of this argument they note that the forerunner of § 41-21-63 specifically enumerated the State Hospital at Whitfield and East Mississippi State Hospital instead of "public treatment facilities." Of course, Lee argues in her reply brief that this change shows the intent of the legislature to broaden the scope of coverage to all instances where a person is kept for treatment against her will, no matter whether the institution is publicly or privately owned.
*36 In interpreting statutes passed by the legislature, certain rules of construction are used by the Court. This Court has stated that
where a statute enumerates and specifies the subject or things upon which it is to operate, it is to be construed as excluding from its effect all those not expressly mentioned or under a general clause, those not of like kind or classification as those enumerated [Inclusio unius est exclusio alterius.] Akers v. Estate of Johnson, 236 So.2d 437 (Miss. 1970).
Southwest Drug Co. v. Howard Bros. Pharmacy of Jackson, Inc., 320 So.2d 776, 779 (Miss. 1975). Thus, the difficult question becomes, did the legislature, by modifying "treatment facilities" with the word "public" mean to restrict applicability of the chapter to only state-owned facilities?
Another of our maxims of construction aids our determination of this issue. In a comprehensive act of the Legislature, "the legislative intent must be determined from the total language of the act and not from one section thereof considered apart from the remainder." Pearl River Valley Water Supply Dist, et al. v. Hinds Cty., et al., 445 So.2d 1330 (Miss. 1984) (citations omitted). Other provisions of Chapter 21 seem to indicate that the legislature did not intend such a restricted scope of coverage. For example, § 69 states that the examining physicians shall state whether or not the patient "should be committed to a treatment facility," omitting the term "public." Section 73(4) authorizes the chancellor to "[c]ommit the patient for treatment in the least restrictive treatment facility which can meet the patient's needs," again omitting the term "public." Sections 81, 82, 83, 85, 87, 91, 95, 97, 99, 101, 101 and also 103 refer simply to "treatment facility" without using the term "public."
When read together, we are of the opinion that the chapter shows an intent by the Legislature to provide comprehensive measures for dealing with those who need mental treatment, but will not seek it themselves. This includes private treatment facilities. If the statute were construed as the appellees desire, it would be farcical. Thus, the holding of the lower court that Lee could not, as a matter of law, prove a case of false imprisonment, is in error. The lower court erred in granting summary judgment on this issue.

II. WHETHER THE DOCTRINE OF SOVEREIGN IMMUNITY EFFECTIVELY SHIELDS McKINLEY AND ALEXANDER FROM SUIT?
McKinley and Alexander both admit that they discussed Lee's case with Dr. Jones and concurred in the decision to send Lee to St. Dominic. Also, Alexander actively participated in the restraint of Lee on May 29 when she tried to leave the Greenwood-Leflore Hospital. McKinley communicated with Dr. Guild after Lee had been transferred, relaying the erroneous drug test results.
"All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or lend aid or encouragement to a wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit, are equally liable." Prosser and Keeton, Prosser and Keeton on the Law of Torts, § 46 (5th Ed. 1984). See Bacon v. Bacon, 76 Miss. 458, 24 So. 968 (1899). "[A]ll who united in procurement of the illegal commitment are equally liable in an action for false imprisonment." Id. 24 So. at 969.
The summary judgment should not have been granted.

III. STATUS OF REGION VI MENTAL HEALTH CENTER IN THIS SUIT.
Although the Region VI Mental Health Center remains a named party to this suit, Lee does not address the summary judgment granted the center in her briefs to this Court, and the Center has not filed a brief. Thus, the Court has no argument before it with regard to the judgment for the Center and that judgment is affirmed.

IV. WHETHER OR NOT THE LOWER COURT ERRED IN FAILING TO GRANT PLAINTIFF, LISA STEVENS LEE'S MOTION FOR SUMMARY JUDGMENT ON PARTIAL ISSUES OF LIABILITY AGAINST THE DEFENDANTS, ST. DOMINIC-JACKSON MEMORIAL

*37 HOSPITAL, GREENWOOD-LEFLORE HOSPITAL, WILLIAM D. JONES, M.D., ROBERT L. McKINLEY, JR., M.D., AND MORRIS ALEXANDER, M.A.?
There is no merit in Lisa Lee's motion for summary judgment against all the defendants and the judgment as to that issue is affirmed.
AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.
HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
DAN M. LEE, P.J., concurs in results only.
BANKS, J., not participating.