IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 97-60446

———————————————

MYRON BASS,

Plaintiff-Appellant,

versus

PARKWOOD HOSPITAL, Parkwood Hospital/Staff;
DESOTO COUNTY, MS; SUBBULAXMI RAYUDU, Dr.;
VICTORIA SHEETS,

Defendants-Appellees.

———————————————

Appeal from the United States District Court for the
Northern District of Mississippi

———————————————

July 1, 1999

Before GARWOOD, DUHÉ and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Myron Bass (Bass) appeals the district
court's order revoking his *in forma pauperis* status and dismissing
with prejudice his complaint, which asserted purported claims
related to his involuntary civil commitment at Parkwood Hospital
(Parkwood or the hospital) in Mississippi.  We affirm in part,
vacate in part, and remand.

**BACKGROUND**

The Mississippi Code regulates the involuntary commitment of

persons to mental health institutions within Mississippi. *See* Miss. Code Ann. §§ 41-21-61 to -107 (1993 & Supp. 1998). The comprehensive regulatory scheme safeguards the rights of persons subjected to involuntary commitment procedures. *See Chill v. Mississippi Hosp. Reimbursement Comm'n*, 429 So.2d 574, 578 (Miss. 1983) ("Without doubt the State of Mississippi . . . has vested rights in the mentally ill substantially in excess of those minimum protections required by the federal constitution."). The regulations govern commitment to private as well as public institutions operating within the State. *See Lee v. Alexander*, 607 So.2d 30 (Miss. 1992).

To initiate civil commitment proceedings, any "interested person" may file an affidavit with the clerk of the state chancery court. Section 41-21-65. This affidavit must contain specific factual descriptions of the behavior of the proposed patient (or proposed respondent), and must be supported by observations of named witnesses. "Affidavits shall be stated in behavioral terms and shall not contain judgmental or conclusory statements." *Id.* Section 41-21-79 provides that if the respondent is found by the court not to be in need of medical treatment, the costs of the proceedings, including prehearing hospitalization costs, shall be taxed to the affiant. Section 41-21-79.

If the affidavit is sufficient,[1] the clerk, upon the

---

[1]  *See* section 41-21-67(1) ("Provided, however, that when such affidavit fails to set forth factual allegations and witnesses sufficient to support the need for treatment, the chancellor shall refuse to direct issuance of the writ.")

chancellor's direction, will issue a writ directing the county sheriff to bring the respondent before "said clerk or chancellor, who shall order pre-evaluation screening and treatment by the appropriate community mental health center . . . and for examination as set forth in Section 41-21-69." Section 41-21-67(1). "Upon issuance of the writ" the chancellor is directed to appoint two reputable physicians (or one physician and one psychologist) to examine the respondent. Section 41-21-67(2). The clerk is directed to ascertain whether the respondent has an attorney, and if not, the chancellor is directed to "appoint an attorney for the respondent at the time the examiners are appointed." Section 41-21-67(3). If the chancellor finds probable cause to believe that the defendant is mentally ill and no reasonable alternative exists to detention, then the chancellor may order that the respondent be detained as an emergency patient pending an admission hearing. Section 41-21-67(4).

Within twenty-four hours after the order for examination, the respondent must be given an examination. Within the same twenty-four-hour period, the physicians must have completed the examination and filed reports and certificates with the court, reporting on their findings as to the respondent's mental and physical health and opining whether the respondent should be committed. Section 41-21-69(2).[2] At the beginning of the

---

[2] If the period would end in nonbusiness hours, it is extended to the commencement of the next business day. *Id*. The code also authorizes the court, upon request, to extend this time frame by no more than eight hours. *See* section 41-21-69(2). The timely filing of the physicians' certificates is also a predicate to the

examination, the respondent is entitled to be told of the purpose of the examination, his right to refuse to answer any questions, and his right to have an attorney present.  Section 41-21-69(3).

If the examiners certify that the respondent is not in need of treatment, the chancellor or clerk "shall" dismiss the affidavit. Section 41-21-71.  This language arguably removes any discretion from the chancery court to continue commitment procedures or otherwise detain the respondent without the recommendation of the appointed physicians.

Allegations of Bass which are either uncontroverted or are supported by summary judgment-type evidence indicate that several of these procedural safeguards were not followed with respect to his eight-day confinement at Parkwood, as outlined below.[3]  On Monday, April 22, 1996, Bass decided to seek mental health counseling for "job related stress."  Bass, a resident of West Memphis, Arkansas, discovered Parkwood through his telephone directory.  Parkwood, located in DeSoto County, Mississippi, is a private hospital and is not associated with either the County or the State.

Bass contacted Parkwood and spoke briefly with defendant-appellee Case Management Associate Victoria Sheets (Sheets), who invited Bass to come to Parkwood for counseling.  Satisfied that

---

continuation of commitment procedures and the order for a commitment hearing.  *See* section 41-21-71.

[3]      We do not determine whether on a more fully and appropriately developed record these factual assertions of Bass will be either established or adequately supported.

Parkwood would be both confidential and affordable to him, Bass agreed, and drove approximately thirty miles from his home to Parkwood. Bass intended to receive outpatient treatment and return home that evening.

Bass arrived at approximately 1:00 p.m. Sheets interviewed Bass upon his arrival. Sheets reported that during the interview, Bass claimed to have been hearing voices and that he planned to poison his co-workers at a pot-luck dinner. Sheets arranged for a psychologist, Russel Reynolds, Ph.D. (Dr. Reynolds), not a defendant herein, to evaluate Bass. Dr. Reynolds also reported that Bass revealed hallucinations and plans to kill his co-workers. Bass denies having made any of these statements, and states that he answered "NO!" when asked if he were carrying a weapon.

Parkwood thereafter determined that Bass should be detained, and proceeded to the chancery court to initiate commitment procedures. Sheets signed an affidavit stating "Pt [patient] is very psychotic and paranoid. He is hearing voices telling him to harm people and is thinking about killing coworkers with cyanide at a pot luck supper. Thinks government is out to get him."[4]

Meanwhile, two plainclothes DeSoto County sheriff's deputies (not named as defendants) approached Bass and identified themselves as officers from the DeSoto County Sheriff's Office. The officers told Bass that he would be staying in the hospital overnight. When

_____

[4]    The affidavit erroneously lists Bass as a resident of DeSoto County, Mississippi. It also attests that after diligent inquiry, Bass's next of kin remained unknown. Bass resided in Arkansas with his wife and children.

Bass protested that he wanted to leave, the officers told Bass that he was not free to do so. At some time before 2:15 p.m., Bass was taken to "the quiet room," where he stayed overnight. Bass alleges that the doors were locked behind him.

At 3:00 p.m., a special master of the chancery court of Mississippi's Third Judicial Court District issued a Writ to Take Custody [of Bass] for Mental Examination or Retention (Writ). The Writ commanded the Sheriff of DeSoto County to "immediately take RESPONDENT into your custody and transport him/her to be assessed for pre-evaluation screening at the Region II Mental Health Center and if recommended, for examination for commitment according to law by those appointed and named on the attached Appointment of Physician/Psychologist." A notation at the top of the Writ states: "ATTENTION DEPUTY SHERIFF: Please serve the attached copy on Myron Bass who is presently located at Parkwood Hospital. You should then leave him/her at Parkwood."

No document appointing a physician appears to have been attached to the Writ. No attorney was ever appointed for Bass, despite Bass's request for an attorney during his first day at Parkwood.

Bass asked to speak to a doctor, but was not permitted to do so until the next day when a doctor prescribed Bass eight milligrams of the anti-psychotic drug Trilafon. Bass objected to taking the medication, but was informed that he could not refuse the medication, and that if he did not swallow the pill, the nurse would inject him with medication. Bass states that he only

6

pretended to swallow the pill.  The doctor did not conduct any examination of Bass at this time.

Bass waited three days before receiving a medical examination on Thursday, April 25, 1996.  The examining physician found that Bass was not in need of mental treatment.  Despite the examining physician's determination, Bass was held at Parkwood for five more days until Tuesday, April 30, 1996, when the chancery court vacated the writ and ordered Bass's release.

Parkwood has since billed Bass over $7,000 for the cost of his hospitalization.

In July 1996, Bass, proceeding *pro se,* filed this suit in the court below against Parkwood, DeSoto County, and Sheets.[5]  Bass's *in forma pauperis* complaint alleges that Parkwood and Sheets maliciously and in bad faith falsified the affidavit, that Bass was denied due process throughout his detention, that Parkwood failed to accommodate his religious dietary preferences, that Parkwood failed to accommodate his disability (involving a leg injury), and that Parkwood discriminated against him on the basis of race.  Bass requested $100,000 in damages in addition to costs, and an order that defendants "discontinue bad faith commitments."  We interpret Bass's complaint to attempt to assert claims under 42 U.S.C. § 1983 (1999), 42 U.S.C. § 2000a (1999), and Mississippi tort law.

The district court referred the case to a magistrate judge for a *Spears* hearing.  *See Spears v. McCotter*, 766 F.2d 179 (5th Cir.

---

[5]     Bass also named Dr. Subblaxami Rayudu as a defendant.  The district court dismissed the claims against Dr. Rayudu and Bass has voluntarily abandoned them on appeal.

1985); 28 U.S.C. § 636(b)(1)(A) (1999). At the hearing, the magistrate judge revoked Bass's *in forma pauperis* status. The magistrate judge recognized that the general procedure in such a situation has been to dismiss a complaint without prejudice, granting the plaintiff leave to amend. Nonetheless, the magistrate judge determined that Bass's claims should be dismissed on the merits. The district court in June 1997 adopted the magistrate judge's report and recommendations and dismissed Bass's complaint. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (1999) (directing court to dismiss *in forma pauperis* action if case "fails to state a claim on which relief may be granted.").

We affirm the revocation of Bass's *in forma pauperis* status. We also affirm the dismissal of Bass's claims under 42 U.S.C. § 1983, and 42 U.S.C. § 2000a against all defendants, as well as all claims against DeSoto County. We vacate the dismissal of Bass's state law claims against Parkwood and Victoria Sheets and remand those claims to the district court.

**DISCUSSION**

**I. Standard of Review**

We review the dismissal of a complaint under subsection 1915(e)(2)(B)(ii) *de novo*. The district court's dismissal of a complaint under this subsection may be upheld only if, taking the plaintiff's allegations as true, it appears that no relief could be granted based on the plaintiff's alleged facts. *See Bradley v. Puckett,* 157 F.3d 1022, 1025 (5th Cir. 1998). *See also United States v. Robinson*, 78 F.3d 172, 174 (5th Cir. 1996)

8

("[Plaintiff's] *pro se* pleading must be treated liberally as seeking the proper remedy.") (citation omitted).

## II.  In Forma Pauperis

The determination whether to allow a plaintiff to proceed *in forma pauperis* is committed to the discretion of the district court.  Finding no abuse of discretion, we affirm the court's revocation of Bass's *in forma pauperis* status.

## III.  The Proper Defendant

The magistrate determined that Parkwood could not be sued because Parkwood is not a legal entity, but is instead merely the name of the hospital in question, which is owned by Magellan, Inc. (Magellan), and Magellan is not named as a defendant in the suit.[6] In timely objections to the magistrate judge's report, Bass, *inter alia*, noted this aspect of the magistrate judge's ruling and also requested that the district court "[a]llow plaintiff . . . leave to amend his complaint."

While the grant or denial of leave to amend pleadings is committed to the sound discretion of the district court, that discretion is tempered by the rule's requirement that "leave shall be freely given when justice so requires."  *See* Fed. R. Civ. P. 15(a); *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998).  The suit was dismissed before any defendants answered or were served, so no party would have been prejudiced by allowing amendment to

---

[6]    At the time of the events in question, Parkwood was owned by Community Health Systems, Inc., a Tennessee corporation. Community Health Systems, Inc. is not a named party to the suit.  In February 1997, Parkwood became "Charter Parkwood," owned by Magellan, Inc.

9

name Parkwood's owner.[7] Further considering the *pro se* nature of Bass's complaint, the district court abused its discretion by dismissing with prejudice Bass's claims on this basis without affording him an opportunity to amend to name Parkwood's owner as a defendant.[8]

## IV. Bass's Federal Claims

Bass's complaint cannot support a cause of action under section 1983. To state a claim under section 1983, a plaintiff must allege facts tending to show (1) that he has been "deprived of a right 'secured by the Constitution and the laws' of the United States," and (2) that the deprivation was caused by a person or persons acting "under color of" state law. *Flagg Bros. v. Brooks*, 98 S.Ct. 1729, 1733 (1978). Because the Fourteenth Amendment protects liberty and property interests only against invasion by the state, a section 1983 plaintiff alleging the deprivation of Due Process under the Fourteenth Amendment must also show that state action caused his injury. *See Landry v. A-Able Bonding, Inc.*, 75 F.3d 200, 203 (5th Cir. 1996). In such cases, the "under color of law" and state action inquiries merge into one. *See Lugar v. Edmonson Oil Co.,* 102 S.Ct. 2744, 2756 (1982) (where state action caused deprivation, actors were necessarily acting "under color of" law.).

---

[7] Because Bass had already filed an amended complaint (twelve days after his original complaint and well prior to the *Spears* hearing), he did not technically come within the first sentence of Fed. R. Civ. P. 15(a).

[8] For clarity's sake, we will continue to refer to the hospital as Parkwood (or the hospital) throughout this opinion.

10

Having been confined to a psychiatric ward against his will, Bass was unquestionably deprived of liberty. *See Dahl v. Akin*, 630 F.2d 277, 279 (5th Cir. 1980); *Humphrey v. Cady*, 92 S.Ct. 1048, 1052 (1972). The issue, therefore, is whether the deprivation of Bass's liberty was caused by state action sufficient to come within section 1983 as to any of these defendants.

Neither the actions of Parkwood nor Sheets may be considered state action. Private action may be deemed state action, for purposes of section 1983, only where the challenged conduct may be "fairly attributable to the State." *Lugar*, 102 S.Ct. at 2753. The fair attribution test has two parts:

> "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." *Lugar*, 102 S.Ct. at 2753-54.

The Supreme Court has applied several different formulas to determine whether seemingly private conduct may be charged to the state. *See Lugar*, 102 S.Ct. at 2754-55 (recognizing public function test, state compulsion test, nexus test, and joint action tests). Under the public function test, a "private entity may be deemed a state actor when that entity performs a function which is traditionally the exclusive province of the state." *See Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989). However, "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg*

11

*Bros,* 98 S.Ct. at 1734 (finding that "resolution of private disputes," was not a traditionally exclusive function of government).

The state compulsion (or coercion) test holds that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 102 S.Ct. 2777, 2786 (1982) (citations omitted). The state's mere acquiescence in private conduct, even where authorized by statute, will not transform that conduct into state action. *See Flagg Bros.*, 98 S.Ct. at 1737-38 (holding warehouseman's sale of goods pursuant to statutory self-help measures was not state action).

Under the nexus or joint action test, state action may be found where the government has "so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the enterprise." *Jackson v. Metropolitan Edison Co.*, 95 S.Ct. 449, 457 (1974) (citation omitted). For example, in *Lugar,* the Court found state action based on a statute unconstitutionally authorizing the sheriff to attach a debtor's property on the basis of an *ex-parte* writ. *See Lugar*, 102 S.Ct. at 2744. "[A] private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment." *Id.* at 2756. Under any formula, however, the inquiry into whether private conduct is fairly attributable to

12

the state must be determined based on the circumstances of each case. *Id.* at 2755.

A private citizen does not become a state actor by initiating civil commitment procedures against another person. *Dahl v. Akin*, 630 F.2d 277, 281 (5th Cir. 1980). Mr. Dahl was an elderly widower who intended to remarry. Fearing the loss of her inheritance, Dahl's daughter and her husband convinced a state court to commit Dahl to a mental institution. After his release, Dahl sued his daughter and her husband for the deprivation of his civil rights under section 1983. This Court noted that Dahl's confinement, consummated under the order of a state court, seemed "at first blush" to result from state action. *See id.* at 277. However, upon closer inspection, we concluded that the defendants' alleged acts were more akin to the filing of a private lawsuit which, at least in that case, did not implicate state action. *See id.* at 281-82. A private citizen does not become a state actor merely by filing a private civil action, even where authorized by state statutes. *See Dahl,* 630 F.2d at 281. "It is not enough, where the state in no way compelled appellees' actions [citation], that they acted 'with knowledge of and pursuant to' [state] statutes." Id., (quoting *Flagg Bros*. 98 S.Ct. at 1733) (internal citations omitted). We accordingly affirmed dismissal of Dahl's complaint for failure to state a section 1983 claim. *Id*. at 278 n.1.

Similarly, a private hospital is not transformed into a state actor merely by statutory regulation. *See, e.g., Blum*, 102 S.Ct. at 2786*; Wong,* 881 F.2d at 202 (finding no state action in

13

hospital's disciplinary action against doctor, even though statutes regulated hospital and provided limited judicial review of disciplinary action); *Diagle v. Opelousas Health Care, Inc.*, 774 F.2d 1344, 1348-49 (5th Cir. 1985) (finding no state involvement to support section 1983 action against private nursing home despite state regulation and public funding).

On facts similar to these, several circuit courts have held that a private citizen or hospital does not become a state actor by participating in the civil commitment of a mentally ill individual. *See, e.g., Pino v. Higgs*, 75 F.3d 1461 (10th Cir. 1996); *Ellison v. Garbarino*, 48 F.3d 192 (6th Cir. 1995); *Rockwell v. Cape Cod Hospital*, 26 F.3d 254 (1st Cir. 1994); *Harvey v. Harvey*, 949 F.2d 1127 (11th Cir. 1992); *Spencer v. Lee*, 864 F.2d 1376 (7th Cir. 1989). *See also Jarrell v. Chemical Dependency Unit of Acadiana*, 791 F.2d 373, 374 (5th Cir. 1986) (per curiam) (assuming *arguendo* involuntary commitment might be state action but holding treatment inside hospital was not connected to state).

In *Spencer,* the Seventh Circuit found no state action based on Illinois statutes regulating involuntary commitment procedures. *See Spencer,* 864 F.2d at 1378-79. The statutes in that case permitted the private initiation of commitment procedures. However, the statutes neither encouraged nor required the commitment of mentally ill individuals. *See id.* at 1379. Nor did the case fall under the "public function" theory of state action. *See id.* at 1379. After thorough review of civil commitment procedures, the court determined that private citizens had

14

traditionally been permitted to initiate commitment proceedings. The private commitment of the mentally ill was common practice in eighteenth century England. *See id.* at 1381 (noting that "Bedlam" was originally a private institution). Thus, the commitment and treatment of the mentally ill could not be deemed a function traditionally within the exclusive province of the state. *See id.* Finally, the court compared civil commitment to a citizen's arrest, which has been held not subject to section 1983 challenges. *Id.* at 1380. *See also White v. Scrivner Corp.*, 594 F.2d 140, 142-143 (5th Cir. 1979) (finding no state action in store employees' detention of suspected shoplifters). As in the case of a citizen's arrest or a warehouseman's sale, the statutory authorization of private acts does not transform such conduct into state action: "The statutes authorizing or constraining these private activities may or may not be constitutional [citation]; the activities themselves remain private [citations]." *Spencer*, 864 F.2d at 1381 (citations omitted).

Similarly, Mississippi's civil commitment statutes neither compel nor encourage the private initiation of commitment proceedings. Instead, they merely authorize and regulate the commission of such acts. The fact that the defendants in this case invoked the assistance of the courts and police officers is not sufficient to show a nexus or joint effort between the defendants and the state. *See Spencer*, 864 F.2d at 1381 ("[P]olice assistance in the lawful exercise of self-help does not create a conspiracy with the private person exercising that self-help.") (citing Lugar,

15

102 S.Ct. at 2755 n.21).

Finally, the civil commitment process traditionally has not been not a function exclusively reserved to the State of Mississippi. The Mississippi Constitution of 1890 charged the State with the duty to care for the mentally ill. *See Chill*, 429 So.2d at 579. However, in 1899 the Mississippi Supreme Court upheld a civil suit against two physicians who filed certificates attesting to a woman's insanity and leading to her commitment, even though those physicians were not the parties legally charged with making commitment decisions. *See Bacon v. Bacon*, 24 So.2d 968 (Miss. 1899). This reflects that private citizens in Mississippi have been participating in the civil commitment process for over one hundred years. Mississippi civil commitment cannot be considered a traditionally exclusive public function for purposes of the state action analysis.

Neither Parkwood nor Sheets can be held liable under section 1983.

Bass's section 1983 claims against DeSoto County also fail. Bass first alleges that the officers illegally detained him before the writ was signed, thereby violating his Fourth Amendment rights as applied to the states by the Fourteenth Amendment. The officers are indisputably state actors. However, they are not official policy makers for DeSoto County, and therefore their conduct, even if tortious, cannot bind the County under section 1983. *See Monell v. Department of Social Servs.*, 98 S.Ct. 2018, 2036, (1978). "Under 42 U.S.C. § 1983, a county cannot be held liable on a theory

16

of respondeat superior merely because it employs a tortfeasor." *Esteves v. Brock,* 106 F.3d 674, 677 (1997).  To hold a local government liable for the acts of its agents or officers, the plaintiff must prove that his injury was caused by an official policy or custom of the municipality. *See id.*  Bass has alleged no facts indicating that he was illegally detained pursuant to any official policy or custom of the County.  Therefore, the County cannot be held liable for the allegedly illegal detention.

Bass's second complaint against the county—that he was humiliated by being transported in shackles—simply does not present a constitutional violation.

Similarly, the County cannot be held liable based on the acts or omissions of the chancery court or the special master, because neither's actions represent any policy or custom of DeSoto County. "We have repeatedly held . . . that a municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker." *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir. 1992).  This principle extends to Bass's claims against the special master, who performed duties functionally equivalent to those of a judge. *See Boston v. Lafayette County, Mississippi*, 743 F.Supp. 462, 471 (N.D. Miss. 1990); *cf. Husley v. Owens*, 63 F.3d 354 (5th Cir. 1995) (holding, under section 1983, that absolute immunity for judicial officers applies to other officers performing judicial functions).  Because there is no allegation suggesting that the allegedly improper judicial acts represent the official policy or custom of DeSoto County, the acts cannot subject the

17

County to liability under section 1983.  *See Johnson,* 958 F.2d at 94.[9]  *See also Clark v. Tarrant County*, 798 F.2d 736, 744 (5th Cir. 1986) (Texas district judges are state officers).

Neither Parkwood nor Sheets was a state actor.  Furthermore, no facts are alleged indicating that the acts of the peace officers or of the judicial officers represent any official policy or custom of DeSoto County.  Therefore, we affirm the dismissal of Bass's claims under 42 U.S.C. § 1983 against all defendants.

In addition to challenging the lawfulness of his confinement, Bass alleges that, while at Parkwood, he was discriminated against on the basis of his race and his religion.  42 U.S.C. § 2000a (1999) prohibits even private discrimination on the grounds of race, color, or religion in places of public accommodations.[10] Unlike many other civil rights statutes, however, 42 U.S.C. § 2000a allows only for prospective relief and does not authorize damage awards.  *See* 42 U.S.C. § 2000a-3 (1999); *Newman v. Piggie Park Ents.,* 88 S.Ct. 964, 966 (1968).

Thus, even accepting as true Bass's allegations that he was discriminated against by Parkwood personnel on the basis of his

---

[9]     We note that the chancery court, under Mississippi law, is not an entity of DeSoto County, but is instead a district court of the State, established pursuant to Miss. Code Ann. § 9-5-11 (1991 & Supp. 1998).  The county courts are authorized by Miss. Code Ann. § 9-9-1 (1991) *et seq.*

[10]     "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."  42 U.S.C. § 2000a(a) (1999).

18

race or religion, this statute does not provide a cause of action for damages against Parkwood. Bass did request injunctive relief under this statute by requesting that the district court order Parkwood to "cease all discrimination." However, Bass does not have standing to assert a claim for injunctive relief against the hospital because there is no allegation suggesting that he is likely to again suffer from Parkwood's discriminatory actions. *See Armstrong v. Turner Indus.*, 141 F.3d 554, 563 (5th Cir. 1998).

We also note Bass's arguments on appeal that Parkwood failed to accommodate his disability. However, we can find no facts in Bass's complaint related to any claim on this basis.

## V. Bass's State Law Claims

Bass's complaint contains allegations tending to support state law claims of false imprisonment and malicious prosecution arising out of the allegedly false affidavit and his assertedly unlawful detention. However, Bass has not alleged that DeSoto County or any of the sheriff's deputies were even aware of the falsity of the affidavit, nor do any of the facts alleged suggest such knowledge. Therefore, the County cannot be held liable under any tort theory present here. However, Bass has made a colorable showing of tort law claims against Parkwood and Sheets. The district court erred in summarily dismissing these claims against Parkwood and Sheets with prejudice.

Mississippi courts have long recognized that actions for false imprisonment may arise out an unlawful civil commitment. *See Bacon v. Bacon*, 24 So.2d 968 (Miss. 1899); *Lee v. Alexander*, 607 So.2d

19

30, 34 (Miss. 1992). Under Mississippi law, false imprisonment requires proof only that the plaintiff was detained and that the detention was unlawful. *Lee*, *supra*. On the record as it now stands, Bass has made a colorable showing of both elements of false imprisonment, and his claims should be allowed to proceed against Parkwood and Sheets.

The district court similarly erred in its summary merits dismissal of Bass's claims for malicious prosecution. Malicious prosecution under Mississippi law has six elements:

> "(1.) The institution or continuation of original judicial proceedings, either criminal or civil;
> (2.) by, or at the insistence of the defendants;
> (3.) the termination of such proceeding in plaintiff's favor;
> (4.) malice in instituting the proceedings;
> (5.) want of probable cause for the proceedings; and
> (6.) the suffering of damages as a result of the action or prosecution complained of." *Van v. Grand Casinos of Mississippi, Inc.*, 724 So.2d 889, 891 (Miss. 1998) (citations omitted).

The magistrate judge found that Bass could not prove that the proceedings terminated in his favor, because the special master issued the writ. However, we have been shown no law supporting this position. At least one Florida court has explicitly rejected this argument. *See Pellegrini v. Winter*, 476 So.2d 1363 (Fla. Dist. Ct. App. 1985). In that case, the court concluded that the initial *ex parte* order allowing a preliminary detention was the initiation, rather than the termination, of commitment procedures. *Id*. at 1365. Analogously, in a civil suit arising from the wrongful commitment of the elderly Mr. Dahl, the Texas Supreme Court ruled that the guardianship court's initial commitment action

20

of Dahl was not evidence of probable cause to initiate civil commitment procedures against him. *See Akin v. Dahl*, 661 S.W.2d 917, 919 (Tex. 1983).

We think the Mississippi courts would likely agree that the examination determining Bass was not in need of treatment and the subsequent order for Bass's release constituted a termination in Bass's favor. The examination more closely resembles a determination on the merits than the special master's *ex parte* writ. Moreover, it is difficult to classify the writ as a termination when it truly only authorizes the commencement of commitment proceedings.

Finally, a recent decision of the Mississippi Supreme Court arguably lends some support to this view. *See Van*, 724 So.2d at 893 (holding that a dismissal of criminal charges for failure to prosecute results in the favorable termination of criminal charges.). In *Van*, the court refused an interpretation of "favorable termination" which would "inevitably [leave] some criminal defendants [] with no remedy for a maliciously instituted suit. We believe this result should be avoided." *Id.* Similarly, to hold that the issuance of an *ex parte* writ solely on the basis of an alleged knowingly false affidavit constitutes an unfavorable termination of commitment proceedings would undoubtably leave some maliciously committed individuals without a civil remedy.

Therefore, we hold that the physician's determination on April 25 that Bass was not in need of medical treatment and the chancery court's subsequent vacation of the writ constituted a termination

in Bass's favor for purposes of a malicious prosecution action. Because Bass has made a colorable showing of state tort law claims against Sheets and Parkwood, the district court erred in summarily dismissing his complaint with prejudice.[11]

The lower court erred in determining that Sheets is immune from civil prosecution for her role in procuring Bass's commitment. Section 41-21-105 grants immunity to persons who initiate commitment proceedings in good faith. *See Carrington v. Methodist Medical Center, Inc.,* 1999 WL 275154 (Miss. 1994) (recognizing good faith requirement). However, Bass has alleged that he made none of the statements which the Sheets commitment affidavit says he made in her presence and he has specifically alleged that Sheets acted in bad faith, and on this record that allegation must be taken as true for purposes of the district court's summary dismissal. Section 41-21-105 does not prevent Bass from stating a claim against Sheets.

## VI. Jurisdiction

Bass filed his complaint in federal court pursuant to the general federal question jurisdiction statute, 28 U.S.C. § 1331. As we affirm the dismissal of all of Bass's federal claims, no

---

[11] Bass's pleadings also allege harm to his reputation and the forced administration of medication against his will. These facts might, upon further development, support additional tort claims under Mississippi law. Moreover, Bass argues that he has been charged over $7,000 for his treatment at Parkwood, and that he fears continued collection of bills which he does not owe. The Mississippi Code allows costs relating to a patient's confinement and treatment to be charged to the patient. Section 41-21-79. However, "if the respondent is found by the court to not be in need of mental treatment then all such costs shall be taxed to the affiant initiating the hearing." Section 41-21-79.

22

federal question remains before the district court. However, this fact does not divest the court of jurisdiction: instead, the court must exercise its discretion whether to exercise supplemental jurisdiction over Bass's state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection(a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction"). When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. *See Wong,* 881 F.2d at 204. However, the dismissal of the pendent claims should expressly be *without* prejudice so that the plaintiff may refile his claims in the appropriate state court.[12]

## CONCLUSION

We find no abuse of discretion in the district court's revocation of Bass's *in forma pauperis* status. Bass's federal civil rights claims were properly dismissed as there was no state action in either Sheets' or Parkwood's actions, and DeSoto County cannot be held liable based on the actions of the peace officers or the chancery court. However, Bass has asserted Mississippi law causes of action in tort against Sheets and Parkwood, and Bass should have been permitted to amend his complaint to name the appropriate legal entity as the proper party defendant in lieu of Parkwood. On remand, the district court should exercise its

---

[12]    While Bass has never asserted or pled facts sufficient to support diversity jurisdiction, if on remand he timely and properly seeks to do so, the district court should consider whether the interests of justice, including consideration of Bass's *pro se* status, militates in favor of allowing Bass to do so.

23

discretion under 28 U.S.C. § 1367 to either hear Bass's state law claims or, more likely, to dismiss those claims without prejudice.[13]

The dismissal of all of Bass's federal claims, and of all of his claims against Dr. Rayudu and DeSoto County, is affirmed; the dismissal of the balance of the case is vacated and as to the balance of the case the cause is remanded for further proceedings consistent herewith.

AFFIRMED in part, VACATED in part, and REMANDED[14]

---

[13]     Assuming the case does not proceed on the basis of diversity (see note 12 above).

[14]     Bass's motions to file a supplemental reply brief and a revised supplemental reply brief have been carried with the case. Those motions are hereby granted.